# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ASHLEY IMMING,

     Plaintiff,

v.                                               Civ. No. 23-378 GJF/DLM

OSVALDO DE LA VEGA, MESILLA
CAPITAL INVESTMENTS, LLC,
SOUTHWEST HEALTH SERVICES,
P.A., and MESILLA CAPITAL
INVESTMENTS De MEXICO, S. de R.L.,

     Defendants.

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On March 24–25, 2025, the parties tried this case to the Court. The evidence consisted of 42 documentary exhibits and the testimony of two witnesses. At the conclusion of the evidentiary phase, the Court gave the parties several weeks to submit closing arguments and proposed findings of fact and conclusions of law.

The Court listened carefully to the trial testimony, examined each admitted exhibit, and took sixteen single-spaced pages of contemporaneous notes to assist its recollection of the evidence. In addition, the Court has since re-read the trial transcript in its entirety. Now having thoroughly considered all of the evidence, the parties' written submissions, and relevant authority, the Court issues its Findings of Fact and Conclusions of Law.

To the extent there was conflicting evidence presented as to any fact found by the Court, the Court has credited the testimony and exhibits supporting the finding and did not credit any contradictory testimony or exhibits. The findings and conclusions contained herein are those the Court considered essential to its Judgment. No inference should be drawn about the Court's view

1

of any additional findings or conclusions submitted by the parties not discussed here.

## I.   <u>FINDINGS OF FACT</u>

1.     At all times relevant to this lawsuit, Defendant Osvaldo De La Vega ("DLV") has been a licensed medical doctor in New Mexico.  He has specialized in nephrology since purchasing the Las Cruces practice of a retiring physician, a practice he renamed as "Southwest Health Services, P.A." ("Southwest Health").  *See* Ex. 1 at 1–2 (DLV appointed as registered agent for Southwest Health on December 22, 1993).  The purchase included the medical practice itself as well as dialysis units located in Las Cruces, Alamogordo, and Deming.

2.     DLV was the sole owner and decisionmaker for Southwest Health from its formation to the date on which he sold its assets and closed it down in February 2018.

3.     On the advice of an attorney, DLV created a limited liability company called "Mesilla Capital Investments, LLC" ("MCI") to hold title to the commercial real estate on which his medical practice and dialysis units were located.  *See* Ex. 3 (Management Agreement between MCI and DLV dated March 19, 2004); Ex. 5 (New Mexico Secretary of State document reflecting MCI's date of organization as March 19, 2004).  As explained in greater detail *infra*, DLV used MCI to acquire and hold many commercial properties and other assets throughout the ensuing years.  DLV has been the sole owner, member, and decisionmaker for MCI since its formation.

4.     In addition to being a licensed physician, DLV at all relevant times was an experienced real estate investor and businessman, having invested in real estate for more than twenty years and having managed more than $20 million in real estate holdings.

5.     In or about July 2015, Southwest Health hired Plaintiff Ashley Imming to be a transcriptionist.  Her duties soon evolved to include assisting DLV in managing the daily

operations of the medical practice.

6.     One year later, in or about July 2016, Plaintiff's employment at Southwest Health ended shortly after she disclosed that she was pregnant.

**A.  Plaintiff's Sexual Harassment Lawsuit and the Final Judgment**

7.     On February 13, 2017, Plaintiff sued DLV and Southwest Health in New Mexico state court, alleging *inter alia* that they had violated the New Mexico Human Rights Act (NMHRA) by subjecting her to sexual harassment in the form of a hostile work environment.[1] If found liable for Plaintiff's claims, Defendants faced the potential of *uncapped* compensatory damages, including for emotional distress under the NMHRA, compensatory and  punitive damages for intentional torts, and an obligation to pay Plaintiff's attorney's fees.[2] *See Lujan v. D.R. Horton, Inc.*, No. CIV 04-0057 RB/RLP, 2005 WL 8163764, at *6 ("Damages for emotional distress are recoverable under the NMHRA.") (citing *Nava v. City of Santa Fe*, 103 P.2d 571, 577 (N.M. 2004)); *Sanchez v. Clayton*, 877 P.2d 567, 574 (N.M. 1994) (under New Mexico law, a jury may award punitive damages for an intentional tort, even when it awards only nominal actual damages); N.M.S.A. 1978, § 28-1-13 (permitting a court to award "actual damages and reasonable attorney fees" for NMHRA claim).

8.     The pretrial phase of the state lawsuit lasted just over 29 months, with trial

---

[1] The Court takes judicial notice of publicly-filed records in Plaintiff's state court case, *see United States v. Ahidley*, 486 F.3d 1184 n.5 (10th Cir. 2007) (citation omitted), including the complaint, which included claims by Danika Jackson, another former employee of Southwest Health. *See Imming v. De La Vega*, D-307-CV-2017-00389, Complaint (Feb. 13, 2017).  Jackson settled her claims with Defendants within the first several months the lawsuit was pending.  *See Imming*, D-307-CV-2017-00389, Order of Dismissal as to Danika Jackson (Nov. 22, 2017).

[2] The trial included no evidence of any insurance coverage for the defense or indemnity of Plaintiff's claims. Moreover, even if Plaintiff was awarded a nominal or low-value damage award, the risk of a substantial fee award— to compensate Plaintiff's attorneys for three years' worth of litigation—was significant.

beginning on July 23, 2019. *See Imming v. De La Vega*, D-307-CV-2017-00389, Notice of Hearing: Jury Trial Set for 7/23/19 through 7/26/19 (June 19, 2019).

9.        On July 29, 2019, the jury found for Plaintiff on her sexual harassment claim and awarded her $250,000 against DLV and Southwest Health. *See* Ex. 35 (special verdict form).[3]

10.        On February 13, 2020, the state district court entered a Final Judgment in the amount of $867,971.07, which included the damages award as well as Plaintiff's attorney's fees and costs. *See* Ex. 2. The Final Judgment also provided for post-judgment interest of 15% on the entire amount of the judgment. *Id.*

11.        On February 1, 2023, the New Mexico Court of Appeals denied the parties' cross-appeals, affirmed the trial court, and left the Final Judgment intact. *Imming v. De La Vega*, No. A-1-CA-39116, 2023 WL 1434061 (N.M. Ct. App. Feb. 1, 2023).

12.        Neither DLV nor Southwest Health has ever paid any money toward satisfying the Final Judgment. With post-judgment interest, the amount owed is now nearly $1.6 million.

**B.  DLV's Financial Condition Before and After the Final Judgment**

13.        During the 29 months leading up to the state court trial, DLV enjoyed substantial net worth, as reflected by two categories of documentary evidence. The first category, which arose six weeks before the state court trial, consisted of the parties' "Stipulation Regarding Defendant de la Vega's Net Worth." Ex. 4. The stipulation—dated June 12, 2019—provided that DLV's net worth (defined as assets minus liabilities) "exceeds $25 million dollars."[4] *Id.* The Stipulation did not elaborate on which assets or liabilities were considered or their respective values.

---

[3] The jury found for Defendants on Plaintiff's claims of retaliation and civil battery.

[4] DLV also judicially admitted this to be his personal net worth at that time. *See* ECF 136 (Answer ¶ 1, admitting ¶¶ 77–78 of Second Amended Complaint).

14.     The second category consisted of financial statements prepared by DLV's accountant based primarily on bookkeeping records supplied by DLV himself.  The accountant, Tony Moran, testified credibly that he and his firm created these financial statements for the purpose of disclosing them (with DLV's permission) to DLV's lending banks.  Moran explained that DLV reviewed and approved the statements before they were disclosed to the banks.

15.     Exhibit 25 offered the earliest snapshot of DLV's personal net worth.  Entitled "Statement of Financial Condition and Supplementary Information for the Ten Months Ended October 31, 2018," this document reflected DLV's personal net worth (assets minus liabilities) to be approximately $42,252,545.00.  Ex. 25 at 3.  DLV's ownership interest in MCI accounted for slightly less than $13 million of the overall amount, leaving more than $29 million in personally owned assets.  *See id.* at 2.  Among those assets were $2.1 million in cash and invested cash, seventeen real properties collectively valued at more than $21 million, an airplane worth $2.5 million,[5] $3 million in artwork, several boats, a Bentley, a Porsche, an Aston Martin, and other luxury cars.  Ex. 25 at 2–3.

16.     Although DLV contends that his October 2018 financial statement is "an ambiguous financial statement and no representation that any of these properties in the United States were personally owned," Tr. Vol. I at 17:13–18, the Court rejects that contention as not credible. Despite DLV's characterization, Exhibit 25 speaks for itself, clearly detailing DLV's interest in MCI and, separately, the assets DLV owned *personally*. *See* Ex. 25 at 2–3. Moreover, Tony Moran testified that he reviewed financial statements with DLV, and *after DLV approved*

---

[5] At trial, DLV testified that the Cessna 421 airplane listed in his personal financial statement [*see* Ex. 25 at 2] was in reality a Cessna 550 jet. Tr. Vol. I at 66:8–19.

*them*, they were sent to the banks from which DLV sought financing.

17.     Exhibit 26 depicted DLV's personal net worth as of December 31, 2019, five months after the jury verdict but before the entry of the Final Judgment.  This document calculated his personal net worth to be $36,086,961.00, a reduction of more than $6 million in the preceding fourteen months.  Ex. 26 at 4.  Included in that amount was DLV's ownership interest in MCI, valued at just over $9.3 million.  *Id.* at 2.  This financial statement also listed as a contingency the pending legal proceeding against DLV personally and Southwest Health.  *Id.* at 8.  The contingency explained that Southwest Health was sold in 2018 and thus "Dr. De La Vega will bear any losses related to the lawsuit, however we cannot determine what his economic impact will be."  *Id.*

18.     The Court also received evidence of what DLV's personal net worth was *following* the entry of the Final Judgment in the state case and while the case was on appeal.  Exhibit 27 is the financial statement for the period ending December 31, 2020, and took a somewhat different form than its two predecessors. This was the first such statement after the entry of the Final Judgment and reflected a personal net worth that had now fallen to $25,996,318.00.  Ex. 27 at 2. Of that amount, $21.35 million consisted of real estate holdings in Mexico and another $4.86 million was assigned to DLV's ownership interest in MCI.  *Id.* at 2–3.  Thus, based on information DLV himself provided to his accountant, his personal net worth had gone from more than $42 million in October 2018 to less than $26 million just more than two years later in December 2020. Furthermore, virtually all of his assets were now categorized as ownership interests in two limited liability real estate companies, in contrast to previous years when well more than half of his net worth came from an array of personally owned assets.

19.     Exhibit 28 showed that, as of December 31, 2021, DLV's net worth had gone back

up to $35,416,180.00. Ex. 28 at 2. Of the total amount, almost 98% consisted either of DLV's ownership interest in MCI ($14,030,805.00) or the properties held in his Mexican real estate portfolio ($21,350,000.00). *Id.*

20.     Exhibit 29 was the final financial statement admitted into evidence and the only one prepared *after* the New Mexico Court of Appeals affirmed the Final Judgment in all respects. That statement reflected that, as of June 30, 2023, DLV's net worth had dropped to $29,543,370.00. Ex. 29 at 2. Of the total amount, again almost 98% consisted either of DLV's ownership interest in MCI ($10,831,370.00) or the properties held in his Mexican real estate portfolio ($18,050,000.00). *Id.*

21.     And by August 2020, less than six months after entry of the Final Judgment, DLV's only significant assets other than his corporate ownership interests were a financed vehicle and boat located in New York City. Ex. 34 ¶¶ 357–58; Ex. 34 at 36.

### C.  <u>Asset Transfers to Avoid the Final Judgment</u>

22.     DLV represented that after Plaintiff sued him for sexual harassment, he sold millions in artwork and his luxury vehicles.[6] Curiously, he has no documentation from these high-value sales.[7] Ex. 11 (Interrogatory 9); Ex. 34 ¶ 83; Ex. 34 at 35. As DLV told it, he sold two Andy Warhol art pieces for a combined $640,000[8] to a lady named Elaine who worked for an unnamed brokerage house, but Elaine died of cancer, and he lost her phone number. Tr. Vol. I at 70:15–71:22. As for his Aston Martin, DLV claimed to have sold the car for $440,000, again without

---

[6] DLV testified he sold a Bentley, an Aston Martin, and a Ferrari.

[7] Ex. 11 (Interrogatory 9); Ex. 34 ¶ 83; Ex. 34 at 36; Tr. Vol. I at 72:9–11.

[8] DLV specified that he sold "Soup 1 Campbell Soup" for approximately $400,000 and "Marilyn 31" for approximately $240,000. Tr. Vol. I at 68:20–70:16.

obtaining any documentation from the transaction. The Court does not consider DLV's self-serving testimony concerning the sale of these high-value assets—for which he provided no documentation and only vague details as to the buyers and transactions—to be credible. DLV is either concealing the profit he made from these sales or concealing the artwork and vehicles themselves.

23.    In the 29 months leading up to the state court trial, DLV also initiated two business transactions that ostensibly shrank the pool of available assets that Plaintiff could seize in the event she obtained a monetary judgment against him. The first transaction was DLV's decision in early 2018 to sell his medical practice, co-defendant Southwest Health. The second was DLV's decision in late 2018 to create *another* limited liability entity, this one formed under Mexican law, into which he transferred all of the properties in Mexico he had theretofore owned in his personal capacity. The factual findings related to each transaction follow *seriatim*.

24.    On February 14, 2018, while the parties were immersed in discovery in the state case, DLV consummated the sale of the assets of Southwest Health to New Mexico Kidney Care, LLC. *See* Ex. 6 (Asset Purchase Agreement). The purchase price was $1.2 million. *Id.* ¶ 2.5. The Asset Purchase Agreement required DLV not to compete within a 25-mile radius of his former practice for a period of five years. *Id.* ¶ 5.8. Under a related agreement not offered into evidence, but about which DLV testified, DLV contracted to continue practicing at the same location for two years following the closing date of that sale. DLV fulfilled that obligation, for which he was paid $350,000 per year. By its own terms, the non-compete obligation had three years remaining at the conclusion of DLV's transitional employment with New Mexico Kidney Care.

25.    By December 2018, less than seven months before the scheduled start of the state

court trial, DLV had fully dispersed[9] the proceeds of the Southwest Health asset sale. He used the proceeds in part to capitalize his new limited liability real estate entity in Mexico, Mesilla Capital Investments de Mexico, S. de R.L. ("MCI-MX").[10] *See* Tr. Vol. I at 48–49; *see also* ECF 136 (DLV judicially admitting ¶ 56 of Second Amended Complaint (Ex. 34)). He dispersed the remaining balance of the proceeds to MCI. By stripping Southwest Health of its assets without arranging for it to receive anything in return, DLV ensured that Southwest Health would be unable to pay any judgment that Plaintiff might obtain against it.[11]

26.    DLV officially created MCI-MX on November 29, 2018, roughly nine months after he sold Southwest Health. *See* Ex. 38 at 2. DLV has been the sole owner, member, and decisionmaker for MCI-MX since its formation. By late November 2018, Plaintiff's state court case was nearly two years old, had been vigorously litigated, and its trial was scheduled to begin in seven short months. The trial presented DLV with the *possibility* of an uncapped adverse judgment ostensibly including both compensatory and punitive damages, as well as the

---

[9] Ex. 31 (Interrogatory 20); Tr. Vol. II at 86:13–16. Although DLV testified that the proceeds from the Southwest Health asset sale were deposited in a Wells Fargo Advisor's account, he could not identify the account holder or account number either in his pre-trial discovery responses or at trial. Tr. Vol. I at 42:5–23; Ex. 42 (Interrogatory 3). The Court finds DLV's testimony concerning the deposit of the sale proceeds unhelpful, self-serving, and not credible.

[10] MCI-MX is a co-defendant in this action against which a Default Judgment was entered in the amount of $1,449,392.79 accruing at 15% interest until satisfied. *See* ECF 155.

[11] On August 29, 2024, Southwest Health filed for Chapter 7 bankruptcy protection. *In re Southwest Health Servs.*, P.A., 24-10898-j7, Chapter 7 Petition (ECF 1) (Bankr. D.N.M. August 29, 20024). Southwest Health immediately filed a Notice of Suggestion of Bankruptcy in the instant case. ECF 154. Thereafter, Defendants DLV, Southwest Health, and MCI jointly moved for a stay of these proceedings altogether. ECF 165. The stay was ultimately denied [*see* ECF 184], and the Bankruptcy Court determined that Southwest Health's Bankruptcy Petition was filed "with no legitimate bankruptcy purpose and solely to delay [Plaintiff's] collection efforts." *See In re Southwest Health Servs.*, P.A., 24-10898-j7, Memorandum Opinion and Order Granting Ashley Imming's Motion for Sanctions (ECF 53) (Bankr. D.N.M. August 29, 20024). Similarly, this Court finds that DLV initiated bankruptcy proceeding not to obtain relief for a long-defunct company he had sold and closed more than six years earlier, but instead to further delay and obstruct the timely resolution of Plaintiff's cases then pending against him in New Mexico state court, Texas state court, and in this Court.

accompanying obligation to pay Plaintiff's substantial attorney's fees and litigation costs. The Court finds that, at least as the state case stood in late November 2018, it presented a very serious financial threat to DLV.

27.     DLV used several hundred thousand dollars from MCI and the proceeds of the sale of Southwest Health to launch MCI-MX. He also transferred to it ownership of more than a dozen real estate properties, some of which consisted of multiple units, which altogether were valued at more than $21 million. *See, e.g.*, Ex. 27 at 3. DLV had owned at least four of these properties in his personal capacity for close to 30 years. These properties were described on DLV's financial statements as a penthouse in Cancun (valued at $1.5 million), a house in San Miguel de Allende (valued at $7.5 million), an apartment in Cancun (valued at $300,000), and a lot on Isla Blanca (valued at $5 million). *See* Ex. 25 at 2; Tr. Vol. I at 53–55. Thus, the combined value of these four properties alone exceeded $14 million. But for DLV transferring them to MCI-MX, all of his properties in Mexico (including these four) theoretically would have been available to satisfy any judgment Plaintiff may have obtained in her state case.

28.     Although $21 million in real estate transferred from DLV to MCI-MX, nothing of value flowed back to DLV. In other words, the transfers were not arm's length transactions.

29.     As to the asset sale of co-defendant Southwest Health, the Court finds that DLV initiated and executed that sale and subsequently dispersed its proceeds in full for the primary purpose of minimizing the assets that would be available to pay any judgment that Plaintiff might obtain in the upcoming trial of the state case. The Court further finds that DLV sold the company's assets and dispersed all of the proceeds of the sale "with actual intent to hinder, delay or defraud" (as used in N.M.S.A. 1978 § 56-10-18(A)(1)) Plaintiff in the event she became a judgment creditor

against him or Southwest Health. Although DLV denied that his potential exposure in the state case played any role in the sale and instead insisted that the sale was motivated by his desire to retire from the practice of medicine, the Court rejects that testimony as not credible, for reasons explained *infra*.

30.     The Court finds that DLV created and capitalized MCI-MX, and subsequently transferred to it properties he had long owned in his personal capacity, for the primary purpose of minimizing the assets that would be available to pay any judgment that Plaintiff might obtain in the upcoming trial of the state case.  The Court further finds that DLV did so "with actual intent to hinder, delay or defraud" (as used in N.M.S.A. 1978 § 56-10-18(A)(1)) Plaintiff in the event she became a judgment creditor against him or Southwest Health.

31.     The Court emphasizes that DLV engaged in these transactions *while Plaintiff's case was pending* – at a time when her claims still subjected DLV and his medical practice to a potentially uncapped compensatory and punitive damages award and substantial attorney's fee and cost reimbursement obligations.  The Court finds that the fear of an outsized jury verdict—coupled with an award of fees, costs, and interest—was the predominant reason motivating DLV's decisions to (1) sell the assets of his medical practice after 25 years and promptly disperse the proceeds, and (2) create a limited liability entity in Mexico to hold his real estate properties there, after not seeing fit to do so for nearly 30 years – that is, until Plaintiff filed her lawsuit and pursued her claims.

32.     The Court rejects as not credible the alternative explanation provided by DLV as to why he chose to sell the assets of his medical practice, to wit, that he intended to retire from practicing medicine.  The Court grounds its adverse credibility finding on four principal bases, the

first of which is DLV's demeanor while testifying about the sale of Southwest Health and the creation of MCI-MX, his obvious interest in the outcome of this litigation and in shielding his assets from collection, and his motivation to falsify his explanations for selling his medical practice and creating his real estate company in Mexico.

33.    The second basis for the Court's adverse credibility finding is DLV's conflicting testimony as to how he spent the years following his "retirement" from medicine. According to one account, he retired from medicine for three years once he sold Southwest Health's assets, mostly spending time in Mexico, until he finally gave in to the strong lure of "being a doctor" again. Tr. Vol. II at 10:9–17, 294:1–14. But this account conflicts with other accounts DLV gave as to how he spent those same intervening years, including his testimony that after he closed the sale of Southwest Health's assets, he worked for New Mexico Kidney Care for two years *and* continued to work at Memorial Medical Center and Mountain View Hospital. Tr. Vol. I at 255:25–256:13. In addition, DLV testified that "during the height of the pandemic" he "went to New York for a year and took care of COVID patients when nobody wanted to touch them." Tr. Vol. I at 296:12–14; Tr. Vol. II at 9:17–21. The World Health Organization declared Covid-19 a pandemic on March 11, 2020.[12] Assuming DLV left for New York the very next day, he would have completed his volunteer medical work in New York by March 2021, at the earliest. Given that DLV returned to work in May 2022, when he created his new medical practice,[13] the *longest* period he

---

[12] *See* "CDC Museum COVID-19 Timeline" available at https://www.cdc.gov/museum/timeline/covid19.html. The Court takes judicial notice of the date the WHO declared Covid-19 a pandemic, as it is a matter of public record and not subject to reasonable dispute. *See New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 702, n.22 (10th Cir. 2009) (taking judicial notice of information on official government website).

[13] Ex. 33. DLV testified that he came out of retirement to resume practicing medicine when he established KWC. Tr. Vol. I at 292:19–293:5, 294:1–21.

could have been "retired" from medicine according to *this account* was a little over a year, between returning from New York and starting his new practice.

34.     The third basis for the Court's adverse credibility finding stems from the sheer number of times that DLV's trial testimony was impeached with his own prior statements under oath.  Whether by using DLV's deposition testimony, testimony in the Texas state case or the bankruptcy case, or in sworn answers to written discovery, Plaintiff's counsel successfully impeached DLV's trial testimony nearly *three dozen times*. *See* ECF 247 (Clerk's Minutes from Bench Trial). The Court was and remains stunned at the frequency and impunity with which DLV testified in ways that were directly contrary to, or meaningfully inconsistent with, his previous testimony or sworn statements on the same subjects. The Court has not presided over—or ever participated in or even observed—a proceeding in which a witness's testimony was so thoroughly discredited.

35.     The fourth and final basis of the Court's adverse credibility finding stems from the overall context surrounding DLV's trial testimony in this case. That context includes DLV's efforts before and after the trial of the state case and before the trial of *this* case to do whatever possible to complicate, frustrate, and stymie Plaintiff's ability to collect on any judgment she obtained against DLV or Southwest Health.  The Court finds that, in furtherance of that endeavor, DLV took at least the following steps:  (a) liquidated personally owned assets (including artwork, vehicles, aircraft, watercraft, and a stock portfolio) in a largely undocumented way so as to leave no paper trail; (b) liquidated the assets of the medical practice he had owned and operated for 25 years only to launch a virtually identical practice in the same building serving the same patient base with some of the same employees well before his covenant not to compete expired; (c)

knowingly provided false information to a Texas state court to the effect that a residential dwelling in El Paso (5717 Green Castle Rd.) that he knew he owned personally was instead owned by MCI;[14] (d) fraudulently invoked a Texas homestead exemption for the same dwelling even though he knew it was not his primary residence; (e) sought bankruptcy protection for Southwest Health for the primary purpose of delaying the resolution of Plaintiff's multiple cases then pending against him; (f) just eight months before the trial of the state case that featured the possibility of an uncapped damages verdict against him, DLV formed a Mexican business entity to serve as a limited liability holding company into which he transferred properties with a combined value of more than $21 million that theretofore he had owned in his personal capacity; (g) restructured his financial life that had featured a personal net worth in the tens of millions *before* the state court trial but which he now insisted was in the few thousands *after* the trial; (h) knowingly provided false discovery answers to the effect that his two adult sons each owned 1% of MCI, despite his

---

[14] Plaintiff filed a proceeding in Texas state court to enforce the Final Judgment she obtained in the Third Judicial District Court. Tr. Vol. I at 58:9–12. The District Court in El Paso domesticated the New Mexico judgment and ordered a Sheriff's sale of 5717 Green Castle Rd. See Ex. 45; Tr. Vol. II at 97:17–98:19. DLV filed a Petition to Quiet Title and Application for Temporary Restraining Order and Temporary Injunction, claiming he personally owned the El Paso property as his homestead. Tr. Vol. I at 112:24–114:21. DLV admitted at trial that he purchased the property as a second home with a second home rider. Tr. Vol II at 92:17–93:9. As such, the property could not have been DLV's homestead at that time. After the Texas state judge dismissed DLV's quiet title lawsuit with prejudice, Plaintiff moved to evict DLV and other persons from 5717 Green Castle Rd. Tr. Vol. I at 132:1–4. During the eviction proceeding, DLV testified that his ex-wife possessed a 50% interest in the property, and had never conveyed that interest, and therefore he could not be evicted from the property. Tr. Vol. I at 134:23–135:19. And yet, in the Marital Settlement Agreement reached as part of their divorce proceeding, his ex-wife *had conveyed to DLV* all of her interest in 5717 Green Castle Rd. Ex. 46 at 5. Although DLV also represented that MCI owned the property, he was in fact its sole owner, as documented by each financial statement introduced into evidence. *See* Exs. 21–29. In sum, DLV's false statements and misrepresentations during the Texas litigation concerning 5717 Green Castle Rd. were at least three-fold: he claimed that MCI owned the residence, that the residence was his Texas homestead, and that his wife had a 50% interest in the property. None of those claims were true, nor do they appear to have been the result of faulty memory or innocent mistake. They are instead indicative of the lengths to which DLV would go to thwart Plaintiff's attempts to collect on the Final Judgment.

knowledge that his sons had immediately rejected his offered gifts of percentage ownership; and (i) reconfigured his financial life to minimize to the greatest extent possible any personal income (other than Social Security payments of $3,548/month, which began eight months before the trial of this case) and any personally owned assets.

36.     The Court finds that there is no single, coherent explanation that supplies the connective tissue for this constellation of circumstances *other than* that they were the components of a purposeful and systematic effort by DLV to protect himself and his former medical practice from an adverse judgment in Plaintiff's state case against them.  No other explanation—including that offered by DLV during his trial testimony—squares with this Court's common sense or life experience.

**D.  <u>Corporate Form Abuse</u>**

37.     DLV's egregious abuse of the corporate form—which occurred before, during, and after the state trial—has provided another mechanism for preventing creditors, like Plaintiff, from accessing his assets.

38.     Well before the state trial began, MCI and DLV entered into a Management Agreement that DLV signed and executed on behalf of both himself and MCI. Ex. 3. Pursuant to that Agreement, DLV was and is MCI's only manager and owner and the entity's "sole decision-making member." *Id*. at 1. The Agreement provides that DLV's decisions "will be accepted and will not need any other person, consultant or evaluation from a third party to be valid." *Id*.

39.     Although DLV previously testified and represented that his two adult sons were 1% owners in MCI and that he had documentation showing their ownership, he admitted at trial that his sons *rejected* any ownership interest in MCI contemporaneously with his offer of such

interest. The Court finds that DLV's sons never owned any percentage of MCI, and that DLV has always been its sole owner. To the extent DLV made contrary representations throughout the litigation of this case, those representations were false and aimed at frustrating Plaintiff's collection efforts by misleading her into believing that MCI had potentially innocent owners whose interests would need to be considered before a creditor could access corporate assets.

40.    The Management Agreement also gave DLV full control over and use of MCI's assets.  It provides that DLV is entitled to "the use of any vehicle, property and assets belonging to [MCI], [and DLV] will not be obligated or expected to reimburse [MCI] in any way." Ex. 3 at 1–2. Likewise, DLV has the absolute ability and authority to sell, dispose of, or use company assets, and to distribute money from MCI. Ex. 34 ¶ 104; ECF 136 at 1. The terms of the Agreement also authorize DLV to take a loan from MCI at any time and for any amount, with no obligation to repay and without the obligation to pay interest. Ex. 3 at 2.

41.    In addition to using the corporate form to retain control over assets held by MCI, DLV uses MCI to pay for virtually all of his personal expenses. Although he purports to have no personal expenses of any kind (such as food, housing, vehicles, entertainment, clothing, grooming, health care), the Court finds this testimony to be patently false and bordering on absurd.  Instead, DLV certainly has these expenses but, since at least the entry of the Final Judgment, he simply uses MCI to pay them. In essence, DLV has used MCI financial accounts as his personal bank to service his personal debts and to pay for entirely personal expenses. And notably, there is no credible evidence that MCI has been repaid for any of the outlays it makes to cover DLV's expenses.

42.    By way of example, DLV has used and misused MCI to pay for at least five

categories of expenses that are entirely unrelated to MCI's corporate purpose, which is and has always been related to real estate investment in the United States.

43.    First, MCI has paid and continues to pay DLV's housing and living expenses. For years, MCI has paid the mortgage payments for his primary residence (6825 Brightview Rd, Las Cruces, New Mexico) for which DLV pays no rent. MCI also pays for DLV's utilities and groceries, and it paid the property taxes and insurance for the El Paso residence (5717 Green Castle Rd.) that DLV owned in his personal capacity.

44.    In addition, DLV has used MCI to pay his vehicle expenses to include repairs, tires, and battery expenses for his 2005 Prius, which were identified as MCI vehicle expenses in its accounting records without any distinction between DLV's personal or business use of the Prius. More recently, MCI financed an electric Hummer SUV and a Porsche Taycan, each worth more than $100,000, for DLV's use.

45.    MCI has also covered various litigation expenses of DLV's without any agreement for DLV to reimburse MCI for those expenses. For example, in three different prior sexual harassment matters against him—none of which named MCI as a co-defendant or party—DLV used MCI funds to pay settlements to resolve his personal, individual liability. Next, DLV used MCI money to fund post-judgment litigation against Plaintiff to attempt to quiet title to 5717 Green Castle, even though MCI was neither a named party nor had an ownership interest in that residence. Finally, DLV used MCI's funds to pay for Southwest Health's bankruptcy, even though MCI received no benefit for doing so.

46.    DLV has even used MCI's assets to pay his child support payments, with MCI paying a total of $240,000 in such payments following entry of the Final Judgment, from May 30,

2020 through January 2, 2024. As with MCI's other expenditures on DLV's behalf, there is no expectation that DLV repay MCI for child support payments.

47.    Contrary to MCI's stated business purpose, DLV has also used MCI to capitalize two of his business entities: MCI-MX and Kidney Wellness Center ("KWC").

48.    First, after Plaintiff filed her lawsuit, DLV used more than $500,000 in MCI funds to capitalize MCI-MX and to cover its expenses, though there exists no loan agreement, no obligation to pay interest, and no time limit for MCI-MX to repay MCI. Whereas MCI-MX is a Mexican corporate entity with the business purpose of owning real estate *in Mexico*, MCI has a different purpose and, in fact, cannot legally operate in Mexico.

49.    Second, in or about 2022, after closing Southwest Health and after the state court entered its Final Judgment, DLV opened his new medical practice, KWC, using at least $160,000 of MCI assets. DLV used MCI funds even though investing in a medical practice was outside MCI's stated business purposes. In return, MCI was not provided anything of value. Indeed, the Promissory Note between MCI and KWC—signed by DLV on behalf of both KWC and MCI— provides for no interest to be paid by KWC to MCI. Notwithstanding the existence of the Note, the Court finds that DLV never actually intended, and does not now intend, that KWC will repay MCI any portion of the funds it used to fund KWC. Although DLV testified that KWC "has already paid in its totality the loan to Mesilla Capital Investments,"[15] that testimony is not credible for at least three reasons. First, apart from his testimony to that effect, DLV provided no evidence of payments by KWC to MCI. Second, DLV made a binding judicial admission that KWC is not profitable and has no plans to ever become profitable. Finally, DLV's testimony as to whether the

---

[15] Tr. Vol. I at 171:10–16.

money provided to KWC was a "favor" or a "loan" was inconsistent.[16]

50.     DLV has essentially used MCI assets for *any* purpose he sees fit, and there do not appear to be any constraints on how he does so. By so doing, he has surrendered the legal protection that ordinarily would have extended to MCI's assets from DLV's personal debts.

51.     Not only does DLV seemingly pillage MCI assets at his every whim, his management of MCI does not comport with traditional corporate management norms. In fact, there is little evidence, if any, of proper corporate governance. Indeed, until only months before the Bench Trial in this case, DLV failed to even maintain a separate bank account or accounting ledger for MCI. That is, according to DLV, he obtained a bank account independent from the one he was sharing with MCI only eight months before the Bench Trial, when he began receiving Social Security benefits.

52.     Notably, all of the monetary benefits DLV has received from MCI have come in the form of MCI paying his personal expenses and funding his ventures. As to wages or income, DLV has taken no such compensation from MCI, MCI-MX, or KWC. By conscious design, he has limited his personal income to his Social Security benefits. The Court finds this to be a decision and configuration motivated principally by his desire to immunize himself as much as possible from Plaintiff's efforts to collect on the Final Judgment.

## II. <u>CONCLUSIONS OF LAW</u>

### A. <u>Outside reverse corporate veil piercing is a viable cause of action under New Mexico law.</u>

---

[16] Tr. Vol. I at 171:10–16 (DLV testifying that "Kidney Wellness Center has already paid in its totality the loan to Mesilla Capital Investments, pending the interest."); Tr. Vol. I at 173:24–174:11 (DLV characterizing the transaction with KWC as "a favor" and "not a loan").

1.      As the New Mexico Court of Appeals has acknowledged, "New Mexico courts have not *squarely* addressed whether [outside] reverse veil piercing is permitted under New Mexico law and under what circumstances." *Imming v. De La Vega*, 535 P.3d 693, 695 (N.M. Ct. App 2023) (emphasis added). As a result, this Court must engage in an *Erie* analysis to predict whether the New Mexico Supreme Court would extend corporate veil piercing to the circumstances presented here. *See Amparan v. Lake Powell Car Rental Cos.,* 882 F.3d 943, 947–48 (10th Cir. 2018) (federal courts sitting in diversity must interpret state law and if no such law exists, "endeavor to predict how that [state's] high court would rule") (citation omitted). As this Court has previously framed the legal question at issue, it must

> predict whether the New Mexico Supreme Court would adopt as a valid legal theory outside reverse [veil] piercing when such a theory is deployed (a) by a tort judgment creditor, (b) against a defendant in his personal capacity, (c) whose personal assets are insufficient to pay the judgment, but, (d) is the sole member of his co-defendant LLCs, (e) that have sufficient assets.

ECF 242 at 12. After a thorough review of the relevant authority and the specific facts of this case, the Court finds that outside reverse veil piercing is a viable theory for the reasons that follow.

2.      As the Court has twice previously held in this case, both at the motion to dismiss and summary judgment stages, piercing the corporate veil is a cognizable independent cause of action under New Mexico law. *See* ECF 25 at 23–24 (citing *Imming*, 535 P.3d at 696 (reasoning that an independent action naming MCI as a defendant and seeking recovery on the Final Judgment was a possible avenue for obtaining relief against MCI); *Estate of Bishop v. Mulholland*, No. 30,016, 2011 WL 5397134 (N.M. Ct. App. Sept. 15, 2011) (affirming the trial court's authorization of relief in the context of a standalone piercing the veil claim and in a case mirroring the procedural posture of this case)); ECF 234 at 13 (citations omitted).

3.      Moreover, contrary to DLV's position in his Closing Argument [ECF 254 at 3], the New Mexico Limited Liability Act does not preclude the corporate veil piercing remedy that Plaintiff seeks here. As this Court previously explained, "[g]uided by the Court of Appeals' analysis in *Morrissey*[17] and the absence of any statutory language or case law identifying the Limited Liability Act as the exclusive source of relief for the judgment creditor of an LLC member, the Court is satisfied that the Act does not stand in the way of Plaintiff's attempt to assert a claim for veil piercing in this case." ECF 25 at 18.

4.      While New Mexico courts have not expressly or directly addressed the related issue of whether New Mexico recognizes the theory of *outside reverse* corporate veil piercing, 66 years ago the New Mexico Supreme Court permitted this form of piercing, albeit without naming it as such. In *Addison v. Tessier*, 335 P.2d 554 (N.M. 1959), the defendant debtor transferred assets to a corporation in which he had a 98% interest during litigation against him. *Id.* at 557. Reasoning that "the legal entity of the corporation must be disregarded for purposes of satisfying [the creditor's] judgment," the court permitted the judgment creditor to reach the corporation's assets to satisfy the personal debts of its controlling shareholder. *Id*. Although *Addison* was decided six decades ago, it has neither been questioned by any New Mexico appellate court nor overruled. As such, it represents a *strong* indication that New Mexico would recognize – and indeed has recognized – outside reverse corporate veil piercing.

5.      In performing its *Erie* analysis, the Court may also consider "appellate decisions in other states with similar legal principles . . . and the general weight and trend of authority in the

---

[17] In *Morrissey v. Krystopowicz*, 365 P.3d 20 (N.M. Ct. App. 2015), a case involving traditional corporate veil piercing, the New Mexico Court of Appeals explained that when an entity "is used for an improper purpose and to perpetuate injustice by which it avoids its legal obligations, equity will step in, pierce the corporate veil and grant appropriate relief." *Id.* at 25–26.

relevant area of law." *See Amparan*, 882 F.3d at 948. Notably, "[a]s outside reverse piercing has

evolved, a growing majority of courts across the country have adopted it as a potential equitable

remedy." *Curci Invs., LLC v. Baldwin,* 14 Cal. App. 5th 214, 221 (Cal. Ct. App. 2017) (citations

omitted); *see also Litchfield Asset Mgmt. Corp. v. Howell,* 799 A.2d 298, 312 (Conn. Ct. App.

2002) (noting "a growing recognition of the doctrine of reverse piercing of the corporate veil")

(citations omitted); *McCall Stock Farms v. United States, Inc*., 14 F.3d 1562, 1568 (Fed. Cir. 1993)

(observing that the "overwhelming weight of authority" recognizes reverse alter ego doctrine)

(citations omitted); *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841 (Nev. 2000) ("[M]ost courts

considering the issue [of reserve piercing] have allowed [it].") (citations omitted). A survey of the

decisions across the country reveals that courts in at least Colorado,[18] Connecticut,[19] Florida,[20]

Idaho,[21] Indiana,[22] Iowa,[23] Montana,[24] Nebraska,[25] Nevada,[26] New York,[27] North Carolina,[28]

---

[18] *In re Phillips*, 139 P.3d 639, 641 (Colo. 2006).

[19] *McKay v. Longman*, 211 A.3d 20, 46 (Conn. 2019).

[20] *Barineau v. Barineau*, 662 So.2d 1008, 1009 (Fla. Dist. Ct. App. 1995).

[21] *Minich v. Gem State Devs.*, 591 P.2d 1078, 1084 (Idaho 1979).

[22] *Lambert v. Farm. Bank, Frankfort*, 519 N.E.2d 745, 748–49 (Ind. Ct. App. 1988).

[23] *Cent. Nat'l Bank & Tr. Co. v. Wagener*, 183 N.W.2d 678, 681–82 (Iowa 1971).

[24] *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1393 (9th Cir. 1993) (in tax collection case, Montana Law does not require showing fraud to allow reverse piercing); *Gardner v. Stokes*, No. DV-07-729(B), 2008 Mont. Dist. Lexis 838 at *16–17 (11th Jud. Dist. Ct. Mont. Dec. 23, 2008).

[25] *Medlock v. Medlock*, 642 N.W.2d 113, 127–28 (Neb. 2002).

[26] *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).

[27] *In the Matter of Rockefeller v. Statement Servs., Corp*., 204 A.D.3d 920, 922 (N.Y. App. Div. 2022).

[28] *Reeger Builders, Inc. v. J.C. Demo Ins. Grp., Inc.*, 758 S.E.2d 185, at *4 (N.C. Ct. App. 2014).

Pennsylvania,[29] Texas,[30] Utah,[31] Vermont,[32] Virginia,[33] and Wisconsin[34] have all recognized some form of reverse veil piercing.

6.      In addition to this strong and growing trend among state courts, the Court notes that *federal law* has long recognized traditional piercing to prevent fraud or injustice. *See Nano-Proprietary, Inc. v. Canon U.S.A., Inc.*, No. A-05-CA-258-SS, 2006 WL 6058423, at *6 (W.D. Tex. Nov. 14, 2006) (noting the United States Supreme Court has "long recognized 'the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.'") (citation omitted). And conceptually, the Court can discern no logical basis upon which to distinguish the remedies and purposes of traditional veil piercing from those of outside reverse piercing. After all, in both instances a court disregards the protections normally afforded a corporate entity to prevent abuses of the corporate structure. As the Fourth Circuit has put it, "outside[] reverse piercing 'follows logically the premises of traditional veil piercing[.]'" *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 386 (4th Cir. 2018) (citation omitted). Indeed, the two forms of piercing "share crucial similarities and parallel policy goals," both protecting "third-party creditors who have been harmed by a shareholder's use of the corporate form for an improper purpose." Laura Spitz, *The Case for Outside Reverse Veil Piercing in New Mexico,* 51 N.M.L. Rev. 349, 366 (2021).

---

[29] *Mortimer v. McCool*, 255 A.3d 261, 285 (Pa. 2021).

[30] *Clement v. Blackwood,* No. 11-16-00087-CV, 2018 WL 826856, at *5 (Tex. Ct. App. Feb. 8, 2018).

[31] *M.J. v. Wisan*, 371 P.3d 21, 34 (Utah 2016).

[32] *Winey v. Cutler*, 678 A.2d 1261, 1263 (Vt. 1996).

[33] *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 580 S.E.2d 806, 810 (Va. 2003).

[34] *Olen v. Phelps*, 546 N.W.2d 176, 181 (Wis. Ct. App. 1996).

7.      Finally, the particular circumstances of this unique case and the relevant public policy considerations weigh strongly in favor of recognizing outside reverse piercing lest DLV avoid the legal ramifications of sexual harassment through corporate form abuse.[35] *See Inryco, Inc. v. CGR Bldg. Sys., Inc*., 780 F.2d 879, 882 (10th Cir. 1986) ("The Court will disregard the separate corporate existence where necessary to further public policy or to promote the ends of justice.") (citation omitted).

8.      Violators of the law, as a state court jury found DLV to be, cannot be permitted to evade the ramifications of their legal violations by hiding or transferring personal assets into an entity over which they have exclusive and complete control. Indeed, it would be contrary to public policy for the Court to overlook a judgment debtor's shell games to avoid legal obligations to a judgment creditor. *See Old Republic Ins. Co. v. Eclipse Aviation Corp*., No. A-1-CA-36614, 2019 WL 6170481, at *4 n.4 (N.M. Ct. App. Oct. 10, 2019) ("[A] court may impose liability on the individual or subservient corporation by piercing the corporate veil when someone dealing with the corporation is the victim of fraud, illegality, or injustice."); *Scott v. AZL Res., Inc*., 753 P.2d 897, 901 (N.M. 1998) (the court must "determine whether [a party's] domination or control was used for fraud or other improper purposes to hold it liable on the theory of piercing the corporate veil."). After all, "[v]eil piercing is a purpose-driven, results-based doctrine with a clear substantive goal: prevent the abuse of the corporate form." Spitz, 51 N.M.L. Rev. 349, 367–68. And here, that goal is only served by permitting Plaintiff to pierce MCI's veil. To hold otherwise, would be to permit DLV to *disregard* MCI's veil by merging his financial existence into the entity

---

[35] The Courts notes that tort victims and other involuntary creditors, like Plaintiff, are generally granted greater leniency in piercing the corporate veil than contract claimants. Spitz, 51 N.M.L. Rev. 349, 368. "In an empirical study of 2,908 cases from 1958 to 2006, Professor Peter Oh confirmed that outside reverse piercing claims not only prevail more often in tort than contract, but they also adhere to the voluntary/involuntary creditor distinction." *Id*.

to pay for his personal expenses while at the same time *employing* the veil as a defense against Plaintiff's collection efforts—the essence of corporate form abuse. Under the circumstances presented here, public policy and fairness dictate that Plaintiff should be permitted to do what DLV has done every day since the entry of the Final Judgment: access MCI's funds to pay for DLV's personal expenses, including liability arising from litigation against him.

9.     In sum, the Court finds that New Mexico has implicitly recognized outside reverse corporate veil piercing and – if directly presented with the question – would side with the majority of courts in explicitly recognizing it as a cause of action, particularly under the facts of this case and given the policy considerations at play.

**B.** **Plaintiff has established each element of her corporate veil piercing claim by a preponderance of the evidence (Count I).**

10.     To pierce MCI's veil, Plaintiff must satisfy three elements by a preponderance of the evidence: (1) domination and control; (2) an improper purpose; and (3) causation. *Morrissey*, 365 P.3d at 23–24.[36] "A totality of the circumstances test is used in determining whether to pierce the corporate veil, and each case must be decided on its own facts. The district court's findings of facts may be overturned only if clearly erroneous." *Kinney Shoe Corp. v. Polan*, 939 F.2d 209, 211 (4th Cir. 1991) (citation omitted).

**i.** **First Element: Domination and Control**

---

[36] The Court finds the elements are the same for reverse veil piercing as for traditional veil piercing. *See Mirlis v. Edgewood Elm Hous., Inc.*, No. 3:19-cv-700(CSH), 2021 WL 2109082, at *2 (D. Conn. May 24, 2021) ("A plaintiff seeking by reverse veil piercing to impose liability on a corporation for an individual's fault must prove the same three elements as in traditional veil piercing") (citation omitted). Defendants presented no evidence or argument that the elements for outside reverse corporate veil piercing would be any different under New Mexico law than for traditional veil piercing and have effectively conceded that the elements would be the same. *See* ECF 25 at 19 ("Even if they disagree as to other aspects of corporate veil piercing, the parties identify the same requisite elements under New Mexico law." (citing ECF 17 at 16; ECF 15 at 13)).

11.     The first element requires that the subservient entity "was operated not in a legitimate fashion to serve the valid goals and purposes of that [entity] but . . . instead under the domination and control and for the purposes of some dominant party." *Morrissey*, 365 P.3d at 23.

12.     In determining this element, courts examine many factors, including but not limited to whether undercapitalization exists, the dominant entity has a controlling interest in the subservient entity, there has been commingling of funds, legitimate corporate formalities have been ignored, and self-dealing has occurred. *See Garcia v. Coffman*, 946 P.2d 216, 220 (N.M. Ct. App. 1997); *Estate of Bishop*, 2011 WL 5397134, at *2; Spitz, 51 N.M. L. Rev. 349, 355–56; *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1293 (5th Cir. 1988). Plaintiff need not satisfy each factor to satisfy this element of the piercing analysis. *See Cruttenden v. Mantura*, 640 P.2d 932, 935 (N.M. 1982).

13.     Based on its review of the factors below, the Court finds and concludes that Plaintiff satisfies the first element by a preponderance of the evidence.

### a. *Undercapitalization*

14.     Although DLV had a significant net worth (more than $30 million dollars even apart from his corporate ownership interests) before the Final Judgment was entered, less than six months *after* the judgment his only significant assets outside of his corporate ownership interests were a financed vehicle and boat. Post-judgment, DLV claims to have no personal assets to pay the Final Judgment, as *all* of his net worth is in MCI and MCI-MX.[37] In other words, DLV is undercapitalized.

---

[37] At trial, DLV testified that his net worth *also* included Icarus, LLC. Tr. Vol. I at 77:5–13. But Icarus is no longer a going concern. Tr. Vol. I at 46:17–18.

15.     Moreover, the timing of DLV's undercapitalization is telling, as it coincides with the underlying state court litigation and the Final Judgment against him.

16.     And perhaps most importantly, the trial evidence demonstrated that DLV *purposely* made himself undercapitalized to avoid satisfaction of the Final Judgment. *See Cyprus Amax Minerals Co.*, 28 F.4th at 1008 ("To be sure, purposeful undercapitalization to avoid a potential judgment is 'the principal injustice that might lead a court to disregard the separateness of affiliated entities.'").

17.     This factor weighs strongly in favor of the conclusion that DLV dominates and controls MCI.

### b.   Controlling Interest

18.     "[W]hen substantial ownership is combined with other factors, such as commingling of corporate and personal assets . . . , a court may peer behind the corporate veil and impose liability." *Cancun Adventure Tours, Inc. v. Underwater Designer Co*., 862 F.2d 1044, 1047–48 (4th Cir. 1988). Despite earlier representations to the contrary,[38] DLV (the dominant party) has a 100% interest in MCI (the subservient entity), and no innocent MCI members exist. To the extent DLV made contrary representations, those representations were false and aimed at attempting to complicate and frustrate Plaintiff's collection efforts by misleading her into believing that MCI had multiple innocent owners whose interests must be considered before a court would permit access to corporate assets.

19.     DLV was and is the sole manager, owner, and decisionmaker for MCI, and the

---

[38] As discussed in the factual findings, DLV previously testified and represented that his two adult sons were 1% owners in MCI and that he had documentation showing their ownership. To the contrary, the Court finds that DLV has always been MCI's sole owner,

Management Agreement between himself and MCI demonstrates his control over that entity, including the ability to use any MCI asset without obligation or payment and to take loans from MCI without interest or repayment obligations.

20.      This factor too weighs strongly in favor of the conclusion that DLV dominates and controls MCI.

### c. Commingling

21.      Another important factor courts consider is whether "there is a commingling of corporate funds with the shareholder['s] funds to the benefit of the shareholder[]." *Estate of Bishop*, 2011 WL 5397134, at *2; *see also Garcia*, 946 P.2d at 220. Indeed, some degree of financial separation must be maintained between owners and their entities if the corporate veil is to be honored.

22.      Prior to the Final Judgment, DLV had $800,000 in annual income. But post-judgment, he has *no* personal income "whatsoever," other than social security benefits.[39] That DLV relies on MCI to pay for virtually all of his personal expenses, including his housing, groceries, utilities, vehicles, child support, and personal litigation costs, demonstrates the *lack* of financial separateness that one would expect from a legitimately operated corporate entity. *Trs. of the Michiana Area Elec. Workers' Pension Fund v. La Place's Elec. Co. Inc.*, No. 2:14-CV-244-TLS, 2018 WL 3833529, at *3 (N.D. Ind. Aug. 10, 2018) (permitting veil piercing where corporation paid for individual's mortgage payments and all utilities, despite only using one room

---

[39] Ex. 34 ¶¶ 5, 150–51; Ex. 34 at 36; Tr. Vol. II at 61:7–18, 62:1–4. DLV tried to explain his lack of income by testifying he does not consider practicing medicine "work," and he does not have a "job," but rather has "a hobby which [he] really enjoy[s]." Tr. Vol. II at 60:18–24. But as the Court has found herein, DLV's decision not to receive any income for the medical services he provides is by conscious design and for the purpose of avoiding Plaintiff's collection on the Final Judgment.

of the home).

23.     DLV also makes no distinction between his personal use—as compared to business use—of homes and vehicles, and he and MCI have historically shared a single ledger in his accounting software.

24.     Insofar as DLV attempts to justify his commingling by asserting that the MCI Management Agreement authorizes him to use MCI assets in lieu of an annual salary/compensation,[40] the Court rejects that purported justification. The Management Agreement *demonstrates* commingling; it does not *justify* it. *See Mohawk Drilling Co. v. McCullough Tool Co.*, 271 F.2d 627, 633 (10th Cir. 1959) ("contractual provisions violative of the law or contrary to some rule of public policy are void and unenforceable").

25.     The manner and degree of financial commingling demonstrated at trial weigh strongly in favor of the conclusion that DLV dominates and controls MCI.

### d.  Ignoring Corporate Formalities

26.     Ignoring corporate formalities is a related factor that supports corporate veil piercing. *Estate of Bishop*, 2011 WL 5397134, at *2.

27.     DLV ignored corporate formalities through at least the following actions: (1) failing to maintain a personal bank account or credit card (other than for Social Security, which began approximately eight months before trial); (2) using MCI funds to pay for *all* of his living expenses; (3) sharing a single ledger in his accounting software for entries for both himself and MCI; and (4) using MCI to fund his personal ventures, even though they did not benefit MCI or serve its business purposes. *See OOO "Garant-S" v. Empire United Lines Co., Inc.*, 557 F. App'x 40, 46 (2d Cir.

---

[40] Tr. Vol. I at 284:20–286:3; Ex. 3 at 1–2.

2014) (failure to maintain "separate books and records" is an example of failure to follow corporate formalities); *Quarles v. Fuqua Indus., Inc*., 504 F.2d 1358, 1362 (10th Cir. 1974) ("Circumstances justify disregard of the corporate entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized.") (citation omitted).

28.     Again, this factor weighs strongly in favor of the conclusion that DLV dominates and controls MCI.

### e. *Self-Dealing*

29.     "When a corporate officer or other fiduciary is self-serving in his use of corporate rights or property, disregarding the corporate veil may be appropriate." *Gibraltar Sav.*, 860 F.2d at 1293.

30.     DLV has demonstrated self-dealing by consistently and without restraint using MCI funds to serve his own personal interests. In addition to using MCI to pay for his personal expenses, DLV used MCI capital to fund and support his other corporate ventures. He used MCI funds to open KWC, providing it with more than $160,000 in initial working capital without any negotiations and without charging any interest or requiring repayment. MCI, in turn, receives no benefit for its outlay. Similarly, DLV used more than $500,000 in MCI funds to cover MCI-MX expenses, without any loan agreement, any obligation to pay interest, or any time limit for MCI-MX to repay MCI. And finally, DLV used MCI funds to pay for Southwest Health's bankruptcy, without MCI receiving any benefit or repayment.

31.     This factor, like all those before it, weighs strongly in favor of the conclusion that DLV dominates and controls MCI. Thus, Plaintiff has established the first element by a

preponderance of the evidence.

### ii. <u>Second Element: Improper Purpose</u>

32.    The second element examines whether the entity was employed for an improper

purpose, which requires "elements of unfairness, injustice, fraud, or other in equitable [sic] conduct

as prerequisite to piercing the corporate veil." *Sundancer Indian Jewelry, Inc. v. Hale*, No. 98-

0164 JP/RLP, 1998 WL 36030312, at *3 (D.N.M. Oct. 21, 1998).

33.    In determining whether there was an improper purpose, courts consider many

factors (some of which overlap with those considered for the first element), including

undercapitalization, misrepresentation and/or concealment of assets, an improper scheme to avoid

payment of a debt, using the subservient entity's assets contrary to its stated business purposes,

and mismanagement of the subservient entity. *See Garcia*, 946 P.2d at 221; *Harlow v. Fibron

Corp.*, 671 P.2d 40, 44 (N.M. Ct. App. 1983); *Boxer F2 Ltd. P'ship v. Bronchick*, 722 F. App'x

791, 800 (10th Cir. 2018); *Estate of Bishop*, 2011 WL 5397134, at *4; *W.P. Prods., Inc. v.

Tramontina U.S.A., Inc.*, 101 F.4th 787, 791 (11th Cir. 2024).

34.    Applying these factors below, the Court finds and concludes that Plaintiff has

satisfied the second element by a preponderance of the evidence.

#### a. *Undercapitalization*

35.    As the Court concludes above, DLV purposefully became undercapitalized in

anticipation of and following the Final Judgment. Indeed, DLV's post-judgment

undercapitalization stands in stark contrast to his robust financial position *prior* to the Final

Judgment. *See Klika v. Aerolite SPE Corp.*, No. C82-522, 1983 U.S. Dist. LEXIS 11023, at *20

(N.D. Ohio Dec. 8, 1983) ("stripping the [corporate entity] of its assets and the consequential loss

by the plaintiff of the ability to recover directly from the [corporate entity] is contemplated by the courts as a wrong sufficient to allow piercing of the corporate veil.").

36.    This factor supports the conclusion that DLV used MCI for an improper purpose, just as it supports the conclusion that DLV dominates and controls MCI.

### b. Misrepresentation of Asset Ownership and Concealed Assets

37.    "Misrepresentation of a corporation's assets and purposes is . . . one species of improper purpose." *Garcia*, 946 P.2d at 221. Based on evidence presented at trial, including DLV's frequently-impeached testimony, the Court concludes that DLV's intentional misrepresentations and his withholding of information regarding asset ownership support Plaintiff's position that DLV uses MCI for an improper purpose:  to evade her attempts to collect on the Final Judgment.

38.    First, DLV falsely testified that MCI owned 5717 Green Castle Rd., when he personally owned the property and in fact claimed (falsely) that it was his Texas homestead.[41]

39.    Second and relatedly, DLV falsely represented that he owned no real estate in *either* the United States or Mexico.[42] But at trial, he conceded that he owned real estate in *both* the United States *and* Mexico.[43]

40.    Third, DLV made misrepresentations about and/or attempted to conceal other personally held assets, including high-value artwork and luxury cars.

---

[41] Ex. 34 ¶ 169; Ex. 34 at 36. In an attempt to explain his false testimony related to 5717 Green Castle Road, Defendants have included in their Proposed Findings of Fact and Conclusions of Law an excerpt from DLV's June 8, 2023 deposition. ECF 253 at 15 ¶ 94. Because the Court did not admit that deposition transcript as evidence at trial, however, the Court grants Plaintiff's Motion to Strike [ECF 255] and does not consider the deposition excerpt for purposes of these Findings of Fact and Conclusions of Law.

[42] Ex. 18 (Interrogatory 44); Ex. 9 (Interrogatory 3); Tr. Vol. I at 103:4–104:5.

[43] Tr. Vol. I at 103:4–104:5.

41.    Fourth, DLV withheld crucial details about the Southwest Health asset sale, testifying that he deposited the proceeds into a Wells Fargo account but could not identify the account holder or account number.

42.    Fifth, DLV intentionally made material misrepresentations concerning MCI's ownership when he testified, on more than one occasion, that his two sons held fractional ownership interests in the entity.

43.    Finally, in his October 31, 2018 financial statement, DLV falsely represented that he personally owned his residence at 6825 Bright View Road and "10 Acres next to Dialysis." Ex. 25 at 2. He later testified that these two properties were *always* owned by MCI. Ex. 31 (Interrogatory 21).

44.    Taken together, these instances of false and inaccurate testimony as to the asset ownership, and of the withholding of crucial details concerning these assets, support the conclusion that DLV used MCI for an improper purpose. The numerosity of DLV's "mistakes" as to asset ownership, coupled with his experience and sophistication as a businessman and commercial and residential real estate investor, undermine his claims that he merely misspoke or innocently misunderstood the ownership of particular assets.

45.    This factor weighs heavily in favor of the conclusion that DLV used MCI for an improper purpose.

### c. Scheme to Become Judgment Proof

46.    Courts have authorized reverse corporate veil piercing when a debtor uses entities he or she controls to pay for personal expenses in a scheme to avoid judgments against them. *See, e.g.*, *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 140 F. Supp. 2d 628, 643, 645 (E.D. Va. 2001).

47.     Here, trial evidence demonstrates that DLV engaged in a scheme to make himself judgment proof to avoid Plaintiff's collection on the Final Judgment. In short, DLV personally owned more than $34 million in assets before the judgment, and less than six months after the judgment, his only significant personal assets outside of his corporate ownership interests were a financed vehicle and a boat. The extraordinary scope and timing of DLV's asset depletion demonstrate that DLV intentionally engaged in a scheme to make himself judgment proof.

48.     DLV's reliance on MCI to pay his personal living expenses, with no money flowing back to MCI, further demonstrates that he engaged in a scheme to try to make himself judgment proof. DLV's testimony that he did not "want to have anything in [his] own name"[44] is telling. Although he testified that he doesn't *need* money,[45] he also admitted that he cannot personally pay for the debts he owes.[46] The only reasonable explanation for DLV's position is that he prioritizes being judgment proof.

49.     Moreover, the following additional evidence presented at trial, when considered in its totality, suggests that DLV never *intended* to pay the Final Judgment and had instead resolved to remain judgment proof:

- DLV declined to post a bond,[47] even though he had access, through his control of MCI and MCI-MX, to assets that would have fully satisfied the Final Judgment;
- DLV failed to claim any exemptions when he knew Plaintiff was seeking to seize his personal assets;[48]

---

[44] Tr. Vol. I at 240:22–241:5.

[45] Tr. Vol. I at 285:18–286:3; Tr. Vol. II at 100:22–25.

[46] Tr. Vol. I at 192:12–14.

[47] Tr. Vol. I at 31:23–32:1.

[48] Tr. Vol. I at 32:18–33:3.

- DLV sold Southwest Health's assets—rendering it defunct—during the state court litigation and fully dispersed the $1.2 million in proceeds from the Southwest Health asset sale to his wholly-owned entities, MCI and MCI-MX;
- neither DLV nor Southwest Health paid *any* money towards satisfying the Final Judgment;[49]
- post-judgment, *all* of DLV's net worth is in MCI and MCI-MX; and
- DLV failed to provide a straightforward answer to the Court's straightforward question about why he chose not to access funds from the entities he controlled to satisfy the Final Judgment.[50]

50.    This factor strongly supports the conclusion that DLV uses MCI for an improper purpose.

### d. Use of Assets in a Manner Contrary to Stated Business Purpose

51.    In an unpublished decision, the Tenth Circuit affirmed a trial court's decision to pierce a corporate veil premised in part on a party's use of the corporate entity for "noncorporate purposes," including for the purchase of music, food, and clothes and for car payments. *Boxer F2, L.P.*, 722 F. App'x at 800. In so holding, the court emphasized that "[t]he *amount* of corporate funds devoted to personal expenses d[id] not matter so much as the *fact* that corporate funds were devoted to personal expenses." *Id.*

52.    Here, there is little question that DLV regularly uses MCI assets contrary to MCI's stated business purpose. Among other things, he has employed MCI's money to fund: (1) his new medical practice (KWC); (2) his former medical practice's Chapter 7 bankruptcy; (3) his lifestyle and personal expenses, including his child support obligations and *all* of his living expenses; (4) his *personal* liability in three prior sexual harassment matters in which MCI was not a party; (5)

---

[49] Tr. Vol. I at 49:10–14; Ex. 34 ¶¶ 70–71; Ex. 34 at 36; Tr. Vol. II at 100:17–21.

[50] Tr. Vol. II at 110:5–113:23.

his quiet title lawsuit against Plaintiff over 5717 Green Castle Rd.; (6) and MCI-MX's expenses in Mexico. None of these expenditures furthered MCI's stated business purpose of investing in real estate in the United States. As DLV conceded at trial, it is not a business purpose of MCI to fund bankruptcies, to provide medical practices with funds, to lend money, or to invest in Mexican real estate.[51]

53.    This factor weighs strongly in favor of the conclusion that DLV used MCI funds for an improper purpose.

### e. *Mismanagement of Corporate Entity*

54.    Mismanagement of a corporate entity at any time subsequent to its creation "may be used to establish evidence of an improper purpose." *Estate of Bishop*, 2011 WL 5397134 at *4.

55.    As discussed throughout, DLV has mismanaged MCI by using its funds to pay for all of his personal expenses, to cover his personal litigation costs and liability, and to fund his personal ventures, without any agreement to reimburse MCI and without any benefit to MCI.

56.    In addition, DLV makes no distinction between vehicle use and expenses for personal or business expenses, with MCI covering *all* such expenses.

57.    To the extent DLV contends veil piercing is unavailable because he did not commit tax fraud, that argument is a red herring.  Proof of the commission of tax fraud is not an element of corporate veil piercing, *see Morrissey*, 365 P.3d at 23–24, and Defendants do not point to any authority to suggest otherwise.

58.    Because this factor, like all the others, weighs heavily in favor of the conclusion that DLV has used MCI for an improper purpose, the Court concludes that Plaintiff has satisfied

---

[51] Tr. Vol. I at 161:13–162:14, 172:9–173:14, 179:2–5.

the second element of her veil piercing claim by a preponderance of the evidence.

### iii.  __Third Element:  Cooperative Effort Resulting in Unjust Injury to Plaintiff__

59.     To satisfy the third factor, Plaintiff must "show some knowing or cooperative effort between the related parties which results in unjust injury to [her], even though it may not be possible to prove that the defendant's control directly caused [her] injury." *See Morrissey*, 365 P.3d at 24. "The inability to recover for her injuries is itself a harm caused by [defendant's] misuse and abuse of the corporate form." *Id.* at 26. As shown below and throughout, DLV and MCI engaged in a cooperative effort that unjustly injured Plaintiff.

60.     DLV admits that he engaged in a cooperative effort with MCI,[52] and the Management Agreement between MCI and DLV demonstrates as much. According to the Agreement, DLV may use any MCI vehicle, property, or asset for his personal use, with no repayment obligation and may take loans from MCI at will. Ex. 3 at 1–2. Simply put, DLV uses MCI as his personal piggybank.

61.     Around the time of the Final Judgment, DLV's net worth underwent two drastic changes. First, his personal net worth shrank, from more than $42 million in October 2018 to less than $26 million just more than two years later, in December 2020.  Second, as of December 2020, virtually all of his assets (98%) were ownership interests in MCI and MCI-MX, in contrast to previous years when well more than half of his net worth came from personally owned assets. The depletion of DLV's personal wealth, the corresponding increase in the percentage of wealth held in corporate entities, and the *timing* of those alterations in his personal financial circumstances support the conclusion that there was a cooperative effort between DLV and MCI, which he

---

[52] Ex. 34 ¶ 222; Ex. 34 at 36.

controlled, that resulted in Plaintiff being unable to collect on the Final Judgment. Had DLV's personal assets *not* been depleted while his corporate holdings grew, Plaintiff would have no doubt been able to satisfy the Final Judgment.

62.    Notably, Plaintiff has demonstrated her willingness and ability to seize DLV's personal assets, such as 5717 Green Castle Rd.[53] But because DLV no longer has domestic personal assets worth seizing, DLV and MCI have, thus far, prevented Plaintiff from doing so.[54] In other words, DLV and MCI's cooperative effort has unjustly harmed Plaintiff. *See Morrissey*, 365 P.3d at 25 ("[t]he only reason [the plaintiff] has not been paid the money it is legally owed is because [the defendant company] lacks the necessary capital to satisfy this judgment . . . . Thus, the managing member in [the defendant] was liable for the corporation's debts because he had intentionally manipulated the corporation so as to avoid having to pay any judgment."). The third piercing factor is satisfied.

63.    The Court concludes that Plaintiff satisfies the three requisite elements for outside reverse piercing by a preponderance of the evidence. Notably, the most commonly articulated arguments *against* outside reverse piercing are not present in this case. *See Gould v. Dillard (In re Tomahawk Oil & Gas Mktg., LLC)*, 2016 Bankr. Lexis 4586 at 37 n.10 (Bankr. W.D. Okla. Nov. 22, 2016) ("[t]he most common arguments against reverse veil piercing are that it ignores normal judgment collection procedures, and it fails to protect innocent third parties that would suffer a detriment if a corporation's assets were attached."). Rather than ignoring normal judgment

---

[53] Tr. Vol. I at 58:9–12, 132:1–4.

[54] Ex. 34 ¶¶ 5, 129; Ex. 34 at 36.

collection procedures, Plaintiff has pursued collection,[55] but her efforts have been in vain. In addition, no innocent members exist who would suffer detriment if MCI's veil was pierced. After testifying for years that his two sons had ownership interests in MCI, DLV has now admitted that this representation was incorrect. Plaintiff has established that DLV is and has been the only owner, manager, or member of MCI since its creation.

64.    In the Court's view, "this case patently presents a blending of the very factors which courts have regarded as justifying a disregard of the corporate entity in furtherance of basic and fundamental fairness." *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 689 (4th Cir. 1976). DLV is improperly using MCI to avoid Plaintiff's collection efforts and has made himself undercapitalized with the intent of creating a facade that he cannot access assets to satisfy the Final Judgment. Piercing MCI's veil would serve public policy by allowing Plaintiff to receive the compensation she was awarded by the state court jury, DLV's efforts to conceal his assets notwithstanding. To do otherwise would be to permit DLV to continue using the "legal fiction of a separate corporate structure [and] would result in an injustice toward [P]laintiff." *Cyprus Amax Minerals Co.*, 28 F.4th at 1007.

### iv.  **Remedies**

65.    For all of these reasons, the Court orders the relief Plaintiff seeks in Count I of her Second Amended Complaint: (1) MCI's veil is pierced; (2) MCI is jointly and severally liable for the Final Judgment; and (3) DLV and MCI are enjoined from transferring or encumbering MCI's real estate properties until the Final Judgment is satisfied. In addition, Plaintiff may, within 21

---

[55] Plaintiff has, *inter alia*, obtained a Writ of Execution and Writs of Garnishment [Tr. Vol. I at 57:15–58:3] and seized DLV's real estate (5717 Green Castle Rd.) in El Paso [Tr. Vol. I at 58:9–12; Tr. Vol. II at 131:16–20].

days from entry of these Findings of Fact and Conclusions of Law, and after conferring with

Defendants as to their position, file a motion to appoint a receiver pursuant to N.M.S.A. § 56-10-

21(A)(3)(b), which nominates a person or entity (with that person or entity's consent) qualified

under N.M.S.A. § 44-8-6 to act as a receiver for the purposes of selling MCI's real property and/or

assets to satisfy the Final Judgment.[56]

### C. Plaintiff has established her claim that Southwest Health and DLV violated the New Mexico Voidable Transfers Act by a preponderance of the evidence (Count IV).

66.    Under the New Mexico Voidable Transfers Act (NMVTA), N.M.S.A. § 56-10-1,

*et seq.*, a transfer is voidable under *any* of the following four sections and subsections of the Act:

- N.M.S.A. § 56-10-18(A)(1)—the transfer was made with an actual intent to hinder, delay or defraud a creditor;

- N.M.S.A. § 56-10-18(A)(2)(a)—the transfer was made without receiving a reasonably equivalent value in exchange for the transfer, and the transferor was engaged or was about to engage in a business or a transaction for which the remaining assets were unreasonably small in relation to the business/transaction;

- N.M.S.A. § 56-10-18(A)(2)(b)—the transfer was made without receiving a reasonably equivalent value in exchange for the transfer and the transferor intended to incur, or believed or reasonably should have believed that the transferor would incur, debts beyond the transferor's ability to pay as they became due; *or,*

- N.M.S.A. § 56-10-19(A)—the creditor's claim arose before the transfer, the transfers were made without transferor receiving equivalent value for the transfers, and transferor was insolvent at the time of the transfers, or became

---

[56] *United States v. Bartle*, 159 F. App'x 723, 725 (7th Cir. 2005) (unpublished) ("appointment of a receiver is authorized by the inherent equitable power of a federal court. . . . We review the district court's appointment of a receiver for abuse of discretion."); *Jones v. Wakeeney State Bank*, 100 F.2d 879, 882 (10th Cir. 1939) ("[t]he right of an appellate court to appoint a receiver pending an appeal for the purpose of preserving the property pending its decision has been exercised and would appear to be a right inherent in any court where the appointment is made for strictly preservation purposes.").

insolvent because of the transfers.

67.    As Plaintiff observes, the Court need only find *one* of the above provisions satisfied to find a violation of the NMVTA. *See* ECF 251 at 84 (citing N.M.S.A. §§ 56-10-18, 56-10-19). For the reasons that follow, the Court finds and concludes that the transfers of $1.2 million in proceeds from the Southwest Health asset sale to MCI and MCI-MX were made with the actual intent to hinder, delay or defraud Plaintiff, a creditor of both DLV and Southwest Health, in violation of N.M.S.A. § 56-10-18(A)(1).[57]

68.    First, the timing of the transfers supports an inference of intent to hinder, delay or defraud, as they occurred *during* the underlying sexual harassment lawsuit and shortly before the jury verdict. Plaintiff filed her sexual harassment lawsuit in February 2017, DLV had fully disbursed the $1.2 million in sale proceeds by December 2018, and the jury verdict was issued in January 2019.

69.    Second, DLV disbursed the Southwest Health sale proceeds to two entities over which he had exclusive control, MCI and MCI-MX, and he admits that some of those proceeds went to launching MCI-MX.

70.    Third, although $1.2 million flowed out of Southwest Health following the sale, nothing flowed back. Indeed, DLV presented no evidence at trial that Southwest Health received anything of value for the transfers. Southwest Health has been without any assets since DLV fully disbursed the sale proceeds, and DLV judicially admits that Southwest Health is no longer a going concern. Ex. 34 ¶ 41; Ex. 34 at 36.

---

[57] Pursuant to the Final Judgment, Plaintiff is a creditor, and DLV and Southwest Health are debtors. *See* Ex. 34 ¶¶ 291, 310; Ex. 34 at 36.

71.     Fourth, the transaction structure supports a finding of intent to hinder Plaintiff, as DLV did not sell Southwest Health in its entirety, but sold only *its assets*, leaving all liabilities with Southwest Health.[58] And again, DLV gutted Southwest Health of its assets (but not liability) while Southwest Health was a defendant in Plaintiff's ongoing sexual harassment lawsuit.

72.     Fifth, DLV has refused to provide critical details about the Southwest Health asset sale or the transfers of the proceeds therefrom. For instance, he claimed to have deposited the proceeds of the sale into a Wells Fargo account but failed to identify with any certainty, either in discovery responses or at trial, the account holder or the account number.[59] Relatedly, he testified inconsistently as to whether the proceeds from the Southwest Health asset sale were *initially* transferred to a Southwest Health account.[60]

73.     Sixth, the transfer of assets left Southwest Health, a defendant in Plaintiff's sexual harassment suit, defunct and unable to pay any money towards the Final Judgment she would ultimately obtain. After Southwest Health's assets were transferred away from it, it filed for bankruptcy protection and identified Plaintiff as its only creditor.[61]

74.     Seventh, although DLV has suggested that he sold Southwest Health's assets because he had decided to retire from medicine, the Court is not persuaded. After all, within four

---

[58] Tr. Vol. I at 34:16–21, 40:14–17.

[59] Tr. Vol. I at 42:5–23; Ex. 42 (Interrogatory 3). DLV testified that he could not identify the account holder of the Wells Fargo account at the time he responded to discovery, but he *thought* he could at the time of trial. Tr. Vol. I at 50:1–21. That is, he indicated that *if* he "remember[ed] correctly" the account was in his own name. The Court does not find his testimony to this effect credible or helpful.

[60] Despite having previously testified the money was initially transferred to Southwest Health, at trial he testified that it was not. Tr. Vol. I at 40:18–41:11.

[61] Tr. Vol. I at 156:6–16.

years (and even at risk of violating a non-compete agreement) DLV had opened up a new medical practice at the same address where he operated Southwest Health, with at least three former Southwest Health employees. Further undermining DLV's claims that he sold Southwest Health due to a retirement decision is his contradictory testimony concerning his work history: he testified (a) that he retired after he sold Southwest Health until he opened KWC but also (b) that he continued working as a physician for at least three of the intervening years. Indeed, DLV's contention that he sold Southwest Health because of a decision to retire from medicine is at odds with much of his other testimony. The Court finds and concludes that DLV instead closed his medical practice and sold its assets *during Plaintiff's sexual harassment suit* in an attempt to hinder Plaintiff from collecting on any judgment she might obtain.

75.    Similarly, the Court is not persuaded by DLV's contentions that he considered selling Southwest Health *years* before Plaintiff's sexual harassment lawsuit, that he engaged in negotiations to do so prior to Plaintiff's lawsuit, or that it was only by happenstance that the sale came to fruition during the course of that litigation.[62] DLV's testimony on these matters, like his testimony about most material issues in this case, was not credible. Notably, DLV provided no evidence (other than his own self-serving testimony) of any pre-lawsuit negotiations to sell Southwest Health or its assets. Had such negotiations occurred, he presumably would have produced correspondence and documents, or perhaps testimony from the prospective buyer. He did not.

76.    In sum, the Court finds by a preponderance of the evidence that DLV made the $1.2 million transfers from Southwest Health to MCI and MCI-MX with the requisite intent to hinder,

---

[62] Tr. Vol. I at 248:15–251:10.

delay or defraud Plaintiff as required under N.M.S.A. § 56-10-18(A)(1).

     **i.**   **Badges of Fraud**

     77.    The Court's conclusion with respect to N.M.S.A. § 56-10-18(A)(1) is no different

when considering the so-called "badges of fraud" designed to "assist the trial court in determining

the actual intent of the debtor" under § 56-10-18(A)(1). *See Ellen Equip. Corp. v. C.V. Consultants*

*& Assocs., Inc.*, 183 P.3d 940, 942–43 (N.M. App. 2008) (citation omitted). The "badges of fraud"

factors, which are neither required nor exclusive, include whether:

1) the transfer or obligation was to an insider;
2) the debtor retained possession or control of the property transferred after the transfer;
3) the transfer or obligation was disclosed or concealed;
4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;
5) the transfer was of substantially all the debtor's assets;
6) the debtor absconded;
7) the debtor removed or concealed assets;
8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and,
10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* (citation omitted).

     78.    As to the first factor, DLV transferred the sale proceeds to insiders:  MCI and MCI-

MX.  Not only was DLV the sole owner, decision maker, and member of Southwest Health, he

filled those same roles for MCI and MCI-MX.

     79.    As to the second factor, DLV—as the sole owner, decision-maker, and member of

the corporate entities into which he transferred the sale proceeds—retained control over the funds

after the transfers.

80.     As to the third factor, DLV has concealed critical details about the Southwest Health asset sale and the transfers of the proceeds therefrom, including the account holder and account number for the account into which he purportedly transferred the proceeds.

81.     As to the fourth factor, Plaintiff filed her lawsuit against DLV and Southwest Health in February 2017, well *before* the transfers of the sale proceeds were made in December 2018.

82.     As to the fifth factor, the transfers involved substantially all of Southwest Health's assets, as, collectively, they consisted of the entire proceeds from Southwest Health's asset sale.

83.     As to the seventh factor, DLV concealed assets by, among other things, providing false testimony related to his ownership of real estate.

84.     As to the eighth factor, Southwest Health was provided *nothing* of value—let alone a reasonably equivalent value—as consideration for the $1.2 million transferred to MCI and MCI-MX.

85.     As to the ninth factor, Southwest Health became insolvent shortly after the sale proceeds were transferred to MCI and MCI-MX and ultimately filed for bankruptcy.

86.     As to the tenth factor, the transfers occurred shortly before Southwest Health incurred a substantial debt. Again, the transfers were completed by December 2018, and Plaintiff obtained her jury verdict only seven months later. The Court finds and concludes that the final judgment of $867,971.07 that followed, together with post-judgment interest and Southwest Health's own costs and attorney fees, qualify as a substantial debt. Moreover, at the time the pre-judgment transfers were made, DLV and Southwest Health faced the *potential* of even more

significant compensatory and punitive damages than those that were awarded.

87.    In sum, application of the relevant "badges of fraud" factors confirms the Court's conclusion that the transfers of proceeds from the Southwest Health asset sale were made with the actual intent to hinder, delay, or defraud Plaintiff and therefore violated N.M.S.A. § 56-10-18(A)(1).

### ii.  **Timeliness**

88.    To the extent Defendants argue in their written closing arguments that Plaintiff's NMVTA claims against Southwest Health and DLV under § 56-10-18(A)(1) are untimely [*see* ECF 254 at 5–6], the Court is not persuaded.[63]

89.    N.M.S.A. § 56-10-23, the statute on which Defendants rely, provides that an action brought under § 56-10-18(A)(1) is "extinguished unless . . . brought . . . not later than four years after the transfer was made . . . or, if later, not later than one year after the transfer . . . was or could reasonably have been discovered by the claimant." Defendants insist that Plaintiff's NMVTA claim, which was filed on May 3, 2023, was not made within four years of the sale of Southwest Health, which occurred on February 14, 2018, or the disbursement of sale proceeds to MCI, which occurred by December 2018. ECF 254 at 5. As to the statute's one-year safety valve provision, Defendants contend that Plaintiff failed to present evidence that she could not have reasonably discovered the sale of Southwest Health. ECF 254 at 6.

90.    But critically, Plaintiff *did* present evidence demonstrating DLV's efforts to

---

[63] Defendants included the following assertion as their "Seventh Affirmative Defense" in their Answer to Plaintiff's Second Amended Complaint: "Plaintiff is barred from recovery in whole or in part based upon the applicable statute of limitations by which Plaintiff's claims are precluded." ECF 136 at 4. In addition, they sought as affirmative relief in the Pretrial Order: "Judgment for Defendants on the basis of statute of limitations . . ." ECF 243 at 7. Although Defendants did not identify N.M.S.A. § 56-10-23, the Court declines to find that Defendants waived this affirmative defense.

conceal the transfer of sale proceeds to MCI such that any efforts to discover those transfers at the time they were made would have been frustrated. *See First Southwestern Financial Servs. v. Pulliam*, 912 P.2d 828, 831 (N.M. Ct. App. 1996) (considering, for purposes of the one-year limitation period under N.M.S.A. § 56-10-23, whether the conveyance at issue had been "hidden in any way"). For instance, Plaintiff demonstrated that DLV was not forthcoming about the transfer of sale proceeds, either in discovery responses in 2024 or even at trial. *See* Ex. 42 at 3 (DLV stating in his July 31, 2024 discovery responses that the $1.2 million sale "proceeds were deposited in a Wells Fargo Advisors account, but [he did] not recall the account holder, or account number" and that he "continue[d] to try and re-establish any transactions"); Ex. 31 at 2 (DLV stating in his September 16, 2024 discovery responses that the proceeds of the Southwest Health sale were "fully disbursed by December 2018 for real estate transactions and liability of the real estate companies"); Tr. Vol. I at 257:17–258:8 (DLV testifying that he "d[id]n't remember what [he] did with" the $1.2 million in proceeds from Southwest Health but suggesting that he may have paid down a loan or bought property for MCI, paid taxes, and transferred some unknown amount to MCI-MX).

91.    Moreover, it was *Defendants'* burden at trial, not Plaintiff's, to establish that Plaintiff's NMVTA claims were barred by N.M.S.A. § 56-10-23, which the New Mexico Court of Appeals has described as a statute of repose. *See First Southwestern Financial Services*, 912 P.2d at 830 (explaining that § 56-10-23 "operates in the same manner as other statutes of repose"); *Little v. Baigas*, 390 P.3d 201, 212 (N.M. Ct. App. 2017) (describing a statute of repose as an affirmative defense);[64] *see also Frazier v. Breville USA, Inc.*, No. 3:23-CV-00563, 2025 WL 2088915, at *11

---

[64] In diversity cases, state law determines what qualifies as an affirmative defense. *See Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1161–67 (10th Cir. 2017).

(M.D. Tenn. July 24, 2025) (characterizing a statute of repose as an affirmative defense on which the defendant had the burden of proof at trial); *Snyder v. Honeywell Int'l, Inc*., No. 3:20-CV-74, 2020 WL 6318924, at *2 (N.D. Ohio Sept. 18, 2020) (holding that a statute of repose is an affirmative defense for which the defendant bears the burden at trial to demonstrate satisfaction of the statutory criteria and on which the defendant could not prevail without producing its own affirmative evidence). Defendants having failed to satisfy their burden, the Court concludes that Plaintiff's claims under N.M.S.A. § 56-10-18(A)(1) are not barred by the applicable statute of limitations or statute of repose.

92.    The Court finds and concludes that the $1.2 million transfers to MCI and MCI-MX of the proceeds from Southwest Health's asset sale were made with the requisite intent to hinder, delay or defraud under N.M.S.A. § 56-10-18(A)(1). Having so concluded, the Court need not analyze the other provisions under the NMVTA.

### iii. **Remedies**

93.    The NMVTA is designed to "protect creditors where a debtor has made a conveyance of his property which diminishes his assets to the prejudice of the rights of his creditors." *First Nat. Bank in Albuquerque v. Abraham*, 639 P.2d 575 (N.M. 1982) (discussing the Uniform Fraudulent Conveyance Act, the predecessor to the NMVTA, which shared the same purpose). In providing such protection to creditors like Plaintiff, the NMVTA authorizes this Court to, *inter alia*, "levy execution on the asset transferred or its proceeds"[65] and to grant "any other relief the circumstances may require."[66]

---

[65] N.M.S.A. § 56-10-21(B).

[66] N.M.S.A. § 56-10-21(A)(3)(c).

94.      Pursuant to N.M.S.A. § 56-10-21(A)(1), the Court voids the transfers of $1.2 million in proceeds of the sale of Southwest Health's assets and orders DLV and Southwest Health to tender $1.2 million[67] into the Court Registry not later than 45 days from the entry of these Findings of Fact and Conclusions of Law. The Court further orders DLV and Southwest Health, by that same date, to file a notice indicating that they have so complied. Failure to do so may result in a finding of contempt.

**D.  <u>Plaintiff has established her claim that MCI-MX and DLV violated the NMVTA by a preponderance of the evidence (Count III)</u>.**

95.      Just as Plaintiff established an NMVTA violation with respect to transfers of Southwest Health's sale proceeds, she attempts to establish a violation of that same Act with respect to DLV's transfers of real properties to MCI-MX.[68] As discussed below, she has shown by a preponderance of evidence that DLV violated N.M.S.A. § 56-10-18(A)(1) when he transferred to MCI-MX four real estate properties: (1) a penthouse in Cancun; (2) a condo apartment in Cancun; (3) a house in San Miguel de Allende; and (4) a beach lot in Isla Blanca.

96.      DLV created MCI-MX in November 2018, more than 20 months after Plaintiff filed her sexual harassment suit against him and seven months before she obtained a jury verdict. While that litigation was still ongoing, he transferred the four real estate properties listed above, which

---

[67]The Court declines to reduce Plaintiff's remedy on account of taxes that DLV alleges he paid for the sale of Southwest Health's assets.  Neither DLV nor Southwest Health presented any evidence at trial documenting taxes that were paid as a result of the asset sale. Given that DLV was an experienced real estate investor, the Court further finds and concludes that he sold Southwest Health's assets and "fully dispersed" the proceeds to MCI and MCI-MX, to hinder Plaintiff's collection efforts, knowing there would be potential tax consequences from the sale.

[68] Plaintiff has already obtained a Default Judgment against MCI-MX and, as such, the Court has already found in Plaintiff's favor, and against MCI-MX, as to Counts II (veil piercing), III (NMVTA) and VI (Declaratory Judgment). *See* ECF 155. Pursuant to Federal Rule of Civil Procedure 55(b)(1), the Clerk of the Court awarded to Plaintiff as a sum certain "$1,449,392.79, as of July 31, 2024, which accrues interest from that date moving forward at the rate of 15% per year on the amount of the original Final Judgment." *Id*. at 2–3.

were worth more than $14 million and which had been personally owned by DLV for *decades.*[69] The transfers were not arm's length transactions, as DLV transferred ownership to these properties to an entity that he wholly owned and controlled, and in fact had only recently created, with no value transferring back to him.

97.    The timing of both DLV's creation of MCI-MX and his transfers of real estate into it—in the midst of the sexual harassment litigation—support an inference that DLV's purpose was to hinder Plaintiff's attempts to satisfy any judgment she would ultimately obtain with real estate DLV owned.

98.    The high value of the properties transferred further supports a finding of intent to hinder Plaintiff from attaching those properties to satisfy any judgment. Given that the four properties listed above were worth more than $14 million, they represented approximately 41% of DLV's net worth at the time of transfer.

99.    In addition, DLV's self-dealing supports a finding of the requisite intent. After Plaintiff filed her sexual harassment lawsuit, DLV used more than $500,000 in MCI funds to cover MCI-MX's expenses,[70] including travel costs.[71] Yet there exists no loan agreement, no obligation to pay interest, and no time limit for MCI-MX to repay MCI.[72]

100.    In sum, the Court finds by a preponderance of the evidence that DLV transferred

---

[69] Ex. 25 at 2; Tr. Vol. II at 88:16–89:15.

[70] Ex. 24 at 4 (listing under "Assets" $519,666 as "[d]ue from Mesilla Capital Investments de Mexico"); Ex. 34 ¶ 37; Ex. 34 at 36 (admitting "MCI Mexico was created _after_ Plaintiff Imming filed her sexual harassment lawsuit.").

[71] *See, e.g.*, Ex. 32, Bates Nos DLV-MCI 0641, 643 (listing transfers for travel to Cancun).

[72] Tr. Vol. I at 178:11–179:1.

the four personally-held real properties Plaintiff has identified to MCI-MX with the intent to

hinder, delay or defraud her in violation of N.M.S.A. § 56-10-18(A)(1).73

### i.  **Badges of Fraud**

101.    As with the proceeds from Southwest Health's sale, the Court's consideration of

the "badges of fraud" factors, enumerated *supra*, further supports the conclusion that DLV

transferred real properties to MCI-MX with the requisite intent under N.M.S.A. § 56-10-18(A)(1).

102.    As to the first factor, DLV transferred the four properties to an insider for which he

was the sole member and owner: MCI-MX.

103.    As to the second factor, DLV retained control over the transferred properties

because they were transferred to his alter-ego, MCI-MX. In effect, DLV transferred the properties

to himself.

104.    As to the fourth factor, Plaintiff filed her lawsuit *before* DLV transferred the four

properties. She filed suit in February 2017, and DLV did not even create MCI-MX until

approximately twenty months later.

105.    As to the seventh factor, DLV attempted to conceal assets, including through false

---

73 Even if Defendants had argued that Plaintiff's NMVTA claims against MCI-MX and DLV under § 56-10-18(A)(1)
are untimely—and the Court does not find that Defendants made such an argument with the required degree of
specificity—the argument would be unavailing. As explained above, Defendants bore the burden at trial to establish
the affirmative defense that Plaintiff's NMVTA claims were barred by N.M.S.A. § 56-10-23. Under that statute's one-
year safety valve provision, Plaintiff was required to bring her NMVTA claim within "one year after the transfer . . .
was or could reasonably have been discovered by the claimant." It is not clear from the trial evidence *when* Plaintiff
could have reasonably discovered that DLV transferred real properties that he personally owned in Mexico to MCI-
MX. What *is* clear from the trial evidence is that these transfers were not arm's length transactions (as no money
flowed back to DLV in return and he retained control over the properties), they occurred pre-judgment while the
parties were still embroiled in the state court litigation, DLV made a habit of concealing his assets and asset transfers
from Plaintiff, and even DLV's most recent financial statements do not clearly reflect the now-corporate ownership
of these properties. Moreover, any deeds recording the change in ownership of the real properties at issue would have
presumably been recorded *in Mexico* and therefore more difficult for a foreign party to discover. Under these
circumstances, the Court cannot say that Defendants satisfied their burden to establish untimeliness under N.M.S.A.
§ 56-10-23.

testimony concerning his ownership of real estate.

106.    As to the eighth factor, DLV did not receive any value—let alone a reasonably equivalent value—in exchange for the transfers of real properties. That is, more than $14 million worth of real estate flowed out of DLV's personal ownership to MCI-MX, but nothing flowed back to DLV.

107.    As to the ninth factor, DLV became insolvent after the property transfers were made. According to DLV, he cannot personally pay the debts he owes,[74] and he has no net worth outside of MCI and MCI-MX.[75]

108.    As to the tenth factor, the property transfers occurred shortly before he incurred a substantial debt. The transfers occurred around November 2018,[76] and Plaintiff obtained her jury verdict in July 2019. In other words, DLV transferred the properties during a time when he was defending Plaintiff's sexual harassment suit and in anticipation of – and out of concern for – a potential verdict against him.

109.    In sum, consideration of the "badges of fraud" factors confirms the Court's conclusion that DLV transferred his penthouse in Cancun, his condo apartment in Cancun, his house in San Miguel de Allende, and his beach lot in Isla Blanca to MCI-MX with the actual intent to hinder, delay, or defraud Plaintiff in violation of N.M.S.A. § 56-10-18(A)(1).

   ii.  **Remedies**

---

[74] Tr. Vol. I at 192:12–14.

[75] Tr. Vol. I at 77:5–78:2.

[76] Ex. 38 (Interrogatory 10) (DLV testified that MCI-MX was created November 29, 2018); Tr. Vol. I at 55:7–56:14 (DLV testifying that the transfers occurred when he created MCI-MX).

110.    Pursuant to N.M.S.A. § 56-10-21(A)(1), the Court (1) voids the transfers to MCI-MX of the penthouse in Cancun (valued at $1.5 million), the house in San Miguel de Allende (valued at $7.5 million), the apartment in Cancun (valued at $300,000), and the lot on Isla Blanca (valued at $5 million) (*see* Ex. 25 at 2; Tr. Vol. I at 53–55); and (2) orders DLV and MCI-MX to deed and/or title these properties under DLV's own name, and once that process is complete, to neither change ownership of the properties nor encumber them until Plaintiff's Final Judgment is satisfied, and DLV obtains written approval from this Court.[77] In addition, Plaintiff may, within 21 days from entry of these Findings of Fact and Conclusions of Law, and after conferring with Defendants as to their position, file a motion to appoint a receiver pursuant to N.M.S.A. § 56-10-21(A)(3)(b), which nominates a person or entity (with that person or entity's consent) qualified under N.M.S.A. § 44-8-6 to take charge of the four properties identified above, to provide Plaintiff with any income received from those properties, and to auction them off one by one until the Final Judgment is satisfied.[78]

**E.    Plaintiff has established that she is entitled to a declaratory judgment (Count V).**

111.    Even if outside reverse veil piercing was not a viable independent cause of action under New Mexico law (and the Court finds that it is), the Court finds and concludes, as an independent and alternative ground, that Plaintiff is entitled to the equitable relief sought in Count V of her Second Amended Complaint in the form of a declaratory judgment. *See Morrissey*, 365

---

[77] N.M.S.A. § 56-10-21(A)(3)(a) (a prevailing creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property"); N.M.S.A. § 56-10-21(B) ("If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.").

[78] N.M.S.A. § 56-10-21(A)(3)(b) (a Court may appoint "a receiver to take charge of the asset transferred or of other property of the transferee").

P.3d at 23 ("courts may exercise their equitable power to 'pierce the corporate veil,' thereby requiring shareholders to answer for the corporation's liability.").

112.    To the extent Defendants argue that a request for declaratory judgment is not a recognized cause of action in New Mexico, the Court disagrees. *See Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545, 552 (N.M. Ct. App. 2003) (affirming denial of motion to dismiss cause of action for declaratory relief); *State ex rel. Stratton v. Roswell Indep. Schs.*, 806 P.2d 1085, 1096 (N.M. Ct. App. 1991) (stating elements for "an action seeking declaratory relief"); *see also United States v. Badger*, 818 F.3d 563, 568–72 (10th Cir. 2016) (acknowledging that Utah law may recognize reverse corporate veil piercing, describing the defendants' argument that the government's declaratory judgment claim was merely "procedural, not substantive" as "perplex[ing]," and concluding that the government's pursuit of collection efforts was "no inconsequential, abstract matter" and "suffice[d] for issuance of a declaratory judgment").

113.    In an action seeking declaratory relief, the plaintiff must establish: "[1] a controversy involving rights or other legal relations of the parties seeking declaratory relief; [2] a claim of right or other legal interest asserted against one who has an interest in contesting the claim; [3] interests of the parties must be real and adverse; and [4] the issue involved must be ripe for judicial determination." *Sanchez v. City of Santa Fe*, 481 P.2d 401, 403 (N.M. 1971); *City of Las Cruces v. El Paso Elec. Co.*, 954 P.2d 72, 77 (N.M. 1998). As discussed below, Plaintiff establishes each element by a preponderance of the evidence.

114.    As to the first element, the Court finds and concludes that there is a controversy involving the parties' rights. Plaintiff seeks a finding that DLV and MCI are alter-egos who should be treated as one and the same for purposes of liability for the Final Judgment. DLV and MCI

oppose these proposed findings.

115.    As to the second element, the Court finds and concludes that Plaintiff seeks to hold MCI jointly and severally liable for the Final Judgment, asserts a right and legal interest in MCI and DLV's assets to satisfy that judgment, and both MCI and DLV have an interest in contesting those claims.

116.    As to the third element, the Court finds and concludes that the parties' interests are real and adverse, as Plaintiff seeks to hold MCI jointly and severally liable for the Final Judgment and to access MCI assets to satisfy that judgment, and Defendants oppose such relief.

117.    As to the fourth and final element, the issue before the Court is ripe for judicial determination, as Plaintiff has been unable to satisfy the Final Judgment in her favor.

118.    For the same reasons the Court found that Plaintiff demonstrated entitlement to pierce MCI's corporate veil, the Court exercises its equitable power to grant Plaintiff the relief she requests in Count V in the form of a declaratory judgment.

### i.    **Remedies**

119.    The Court finds and orders that (1) DLV and MCI are alter egos; (2) DLV and MCI shall be treated as one and the same for purposes of liability for the Final Judgment; (3) Plaintiff may seize and/or foreclose on any asset of MCI to satisfy the Final Judgment; (4) DLV and MCI are prohibited from transferring ownership of any MCI asset—including accounts holding cash, invested cash, and securities—until the Final Judgment is satisfied; (5) DLV and MCI are prohibited from using any MCI real estate or asset as a security interest to obtain loan(s)/money dated after the entry of these Findings of Fact and Conclusions of Law; (7) DLV and MCI are prohibited from encumbering any MCI real estate or asset after the entry of these Findings of Fact

and Conclusions of Law and until the Final Judgment is satisfied; (8) a receiver is appointed to: (a) take charge of all MCI real estate and assets, including bank accounts; (b) ensure DLV receives no income/money from MCI real estate; and (c) auction MCI real estate off one by one until the Final Judgment is satisfied.[79]

**F. Plaintiff is entitled to an award of reasonable fees and costs.**

120.    The Court may, in its discretion, award reasonable attorneys' fees and costs if Plaintiff demonstrates: (a) she was the prevailing party in this case; and (b) her case is an "action or proceeding under [the NMHRA]." *See* N.M.S.A. § 28-1-13(D).

**i. Prevailing Party**

121.    "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of [her] claim." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). "In *Farrar*, the Supreme Court easily concluded that [even] a plaintiff who obtains only nominal damages is nevertheless a prevailing party." *Lopez v. City of Albuquerque*, No. 08-806 LH/ACT, 2011 WL 13261990, at *2 (D.N.M. Apr. 11, 2011) (citation omitted). To be sure, "[a] plaintiff who 'succeeded on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit' is a 'prevailing party.'" *Case v. Unified Sch. Dist. No. 233, Johnson County*, 157 F.3d 1243, 1249 (10th Cir. 1998) (citation omitted).

122.    Here, the Court finds and concludes that Plaintiff is the prevailing party, as she obtained substantial relief in this case, including: (1) piercing MCI's veil; (2) voiding the $1.2

---

[79] *United States v. Bartle*, 159 F. App'x 723, 725 (7th Cir. 2005) ("appointment of a receiver is authorized by the inherent equitable power of a federal court. . . . We review the district court's appointment of a receiver for abuse of discretion."); *Jones v. Wakeeney State Bank*, 100 F.2d 879, 882 (10th Cir. 1939) ("The right of an appellate court to appoint a receiver pending an appeal for the purpose of preserving the property pending its decision has been exercised and would appear to be a right inherent in any court where the appointment is made for strictly preservation purposes.").

million transfer to MCI and MCI-MX of the proceeds from Southwest Health's asset sale; and (3) voiding DLV's transfers of four personally-held real properties to MCI-MX.

### ii. "Any Action or Proceeding" under the NMHRA

123.    Plaintiff brought this case to satisfy the Final Judgment she obtained from the Third Judicial District Court.  In the underlying sexual harassment case, Plaintiff prevailed on her claims under the NMHRA, which includes a fee-shifting provision:

> [i]n any action or proceeding under this section, if the complainant prevails, the court in its discretion may allow actual damages and reasonable attorney fees[.]

N.M.S.A. § 28-1-13(D). "[R]ead naturally, the word 'any' has an expansive meaning,' and thus, so long as 'Congress did not add any language limiting the breadth of that word,' the term 'any' must be given literal effect." *Vaughn v. Villa*, 537 F.3d 1147, 1152 (10th Cir. 2008).

124.    Moreover, "the NMHRA has a broad, remedial purpose to prevent discrimination. The statute should be interpreted liberally in order to effect that broad remedial purpose." *Marquez v. Fantastic Foods, Inc.*, No. 05-1349 JH/WPL, 2006 WL 8444224, at *3 (D.N.M. May 25, 2006) (citing *Rodman v. N.M. Emp. Sec. Dep't*, 764 P.2d 1316, 1319 (N.M. 1988); *Russell v. Protective Ins. Co.*, 751 P.2d 693, 697 (N.M. 1988), *rev'd on other grounds by Cruz v. Liberty Mut. Insur. Co.*, 889 P.2d 1223, 1225 (N.M. 1995)); *see also Herald v. Bd. of Regents of the Univ. of N.M.*, 357 P.3d 438, 444 (N.M. App. 2015) ("[T]he language of remedial statutes, including the [NMHRA] . . . , must be liberally construed.").

125.    In the Court's view, the plain language of NMSA § 28-1-13(D), together with the broad, remedial purpose of the NMHRA as a whole, suggest that the statute should be liberally construed to authorize attorney fees in actions seeking to collect on judgments resulting from

successful NMHRA claims. Notwithstanding Plaintiff's pursuit of her piercing and NMVTA claims in federal court, rather than in the underlying state case, this case is, at bottom, a collection action arising from a favorable verdict and judgment on an NMHRA claim. Denying a fee award under the circumstances here would be tantamount to frustrating the purpose of the NMHRA and its fee-shifting provision. *See Hackwell v. United States*, 491 F.3d 1229, 1240 (10th Cir. 2007) (acknowledging that the purpose of fee-shifting statutes for successful civil rights and Title VII claims is to incentivize the vindication of federal statutory rights and that to deny fee awards to prevailing parties would be "tantamount to repealing" those fee-shifting provisions by frustrating their purpose); *Balark v. Curtin*, 655 F.2d 798 (7th Cir. 1981) ("The compensatory goals of the civil rights laws would thus be undermined if fees were not also available when defendants oppose the *collection* of civil rights judgments.") (emphasis added)

126.    Not only does the Court's interpretation of the NMHRA weigh in favor of a fee award here, Tenth Circuit authority addressing fee awards in post-judgment collection actions supports the same conclusion. In *Karnes v. SCI Colo. Funeral Servs.*, 166 F.3d 34 (10th Cir. 1998) (unpublished), an employment discrimination case brought pursuant to Title VII, the Tenth Circuit began with the premise that "[a]ttorney's fees and costs may be awarded for necessary post-judgment efforts." *Id*. at *3 (citing *Joseph A. by Wolfe, v. N.M. Dep't of Human Servs.*, 28 F.3d 1056, 1059 (10th Cir. 1983)). Applying that premise, the Tenth Circuit held that the district court abused its discretion when it refused to award attorney's fees and costs for the plaintiff's post-judgment efforts aimed at obtaining the relief the court awarded on her Title VII retaliation claim (*i.e*., reinstatement). *Id*. at *4–5. Similarly, in *Shaw v. AAA Eng'g & Drafting, Inc*., 213 F.3d 538 (10th Cir. 2000), the Tenth Circuit observed that courts have consistently allowed attorney's fees

for post-judgment enforcement and collection activities in civil rights cases. *Id.* at 544 (citing *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 558–61 (1986)). The court went on to authorize fees for post-judgment collection activities for False Claims Act claims, finding "no reason why the attorney's fees provisions of the [False Claims Act] should be applied differently than those of the civil rights laws." *Id.* at 544–45 (citation omitted).

127.     Ample persuasive authority from other circuits is in accord. *See Fischer v. Adams*, 572 F.2d 406, 409 (1st Cir. 1978) (time spent on appeal in a Title VII action is compensable as part of reasonable attorney's fee); *Torres-Rivera v. O'Neill-Cansel*, 524 F.3d 331, 340-41 (1st Cir. 2008) (additional fees under § 1988 awarded when the underlying judgment was not seasonably paid and collection efforts were arguably necessary); *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999) (a prevailing plaintiff in a § 1983 case was entitled to fees "not only to the cost of obtaining a favorable judgment but also to the cost of successfully defending that judgment, whether against postjudgment motions . . . or against an appeal"); *Titan Indem. Co. v. Cameron*, 77 F. App'x. 91, 98 (3d Cir. 2003) (in § 1988 case, "[t]he District Court did not err in awarding . . . attorney's fees for the declaratory judgment action because the fees were incurred to collect on a civil rights judgment); *Dotson v. Chester*, 937 F.2d 920, 933 (4th Cir. 1991) ("The compensatory goals of the civil rights laws would thus be undermined if fees were not also available when defendants oppose the *collection* of civil rights judgments."); *Vukadinovich v. McCarthy*, 59 F.3d 58, 60 (7th Cir. 1995) ("We have previously held that the presumptive entitlement of a prevailing plaintiff in a civil rights case to an award of reasonable attorney's fees (and related expenses) extends to the fees incurred by the plaintiff in attempting to collect the judgment[.]"); *Jenkins by Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997) ("Reimbursement for post-judgment litigation fees

can be as important as reimbursement for pre-judgment fees in accomplishing the purpose of section 1988."); *Spain v. Mountanos*, 690 F.2d 742, 747 (9th Cir. 1982) (affirming award of fees expended in collecting § 1988 award); *Turner v. Orr*, 785 F.2d 1498, 1504 (11th Cir. 1986) ("the expenses of the [plaintiff], including those of its counsel, incurred in its post-judgment efforts at monitoring and enforcement [in a Title VII case] are properly payable by the defendants as those of a 'prevailing party' whether or not it prevails in each individual post-judgment effort because these 'measures necessary to enforce the remedy ordered by the [district] court cannot be severed from the matters upon which the plaintiff prevailed' in obtaining the judgment.").[80]

128.    Strong public policy reasons also support the award of attorneys' fees and costs to Plaintiff, a victim of sexual harassment. With its "broad social, political, and economic implications[,]" the NMHRA "seeks to remedy an evil that 'threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.'" *Sabella v. Manor Care, Inc*., 915 P.2d 901, 905 (N.M. 1996). (citations omitted). "Allowing a worker subjected to sexual harassment to seek civil damages 'not only vindicates the state's interest in enforcing public policy but also adequately redresses the harm to the individual naturally flowing from the violation of public policy.'" *Coates v. Wal-Mart Stores, Inc*., 976 P.2d 999, 1005 (N.M. 1999) (citation omitted). A related "polic[y] embodied in the [NMHRA] is to encourage lawyers to take cases involving alleged violations of the Act" by awarding fees. *Lucero v. Aladdin Beauty Colls., Inc*., 871 P.2d 365, 367 (N.M. 1994). Each of these important public policies would be undermined if fees were not equally available when defendants oppose the

---

[80] Despite the Court identifying the issue of post-judgment attorney fees as an issue to be addressed in the parties' written closing arguments, Defendants failed to cite any authority to support their position that Plaintiff is *not* entitled to reasonable attorneys' fees and costs as a prevailing party. *Compare* Tr. Vol. II at 119:10–18, *with* ECF 254.

*collection* of NMHRA judgments. Denying fee awards, by contrast, could have the effect of incentivizing judgment-debtors to engage in activities and transactions to hinder and prolong the collection efforts of their judgment creditors.

129.    Awarding Plaintiff her reasonable attorneys' fees and costs in this case will help ensure that her sexual harassment verdict is not a hollow victory. "A culpable defendant [such as DLV] should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring *additional* time to be spent thereafter [to collect on that judgment] without compensation." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999) (emphasis added). After all, the actions Defendants took to hinder Plaintiff's collection on the Final Judgment were what necessitated filing this lawsuit and litigating it for more than two years, and fairness dictates that Plaintiff should be compensated for the fees and costs that resulted. *See Glass v. Pfeffer*, 849 F.2d 1261, 1266 n.3 (10th Cir. 1988) ("It is obviously fair to grant a fee for time spent litigating the fee issue . . . since it is the adversary who made the additional work necessary.") (citation omitted).

130.    Based on the trial evidence, the language and purpose of the NMHRA, relevant precedent, and strong public policy reasons, the Court finds and concludes that this lawsuit constitutes "any action or proceeding under [the NMHRA]" for which attorney fees are statutorily authorized. Plaintiff is thus entitled to her reasonable fees and costs as the prevailing party in *this* lawsuit.

131.    Plaintiff's counsel is therefore directed to file a detailed application for fees and costs, within 21 days of entry of these Findings Fact and Conclusions of Law.

132.    Plaintiff's counsel is further directed to include in the application their position as

to whether a multiplier, or fee enhancement, is appropriate (as the Third Judicial District found that it was in the underlying sexual harassment case), and if so, what multiplier is warranted. *See Atherton v. Gopin*, 272 P.3d 700, 702 (N.M. App. 2012) ("district court erred in concluding that it could not consider the use of a multiplier"); *In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*, 149 P.3d 976, 992 (N.M. App. 2007) ("An award based on a lodestar may be increased by a multiplier if the lower court finds that a greater fee is more reasonable after the court considers the risk factor and the results obtained.").

133.    Defendants are permitted to file, within 14 days of the filing of Plaintiff's fee application, any objections to the number of hours claimed, the hourly rate(s), or any multiplier requested.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*